19486

LOWNDES PRODUCTS, INC., Appellant, v.
Claude A. BROWER et al., Respondents

(191 S. E. (2d) 761)

324

*Messrs. Alfred F. Burgess* and *David L. Freeman,* of *Wyche, Burgess, Freeman & Parham,* P.A., Greenville, *for Appellant.*

*Messrs. Ralph Bailey,* of *Bailey & Dority,* and *Leatherwood, Walker, Todd & Mann,* all of Greenville, *for Respondents.*

September 18, 1972.

*Per Curiam:*

The plaintiff, Lowndes Products, Inc. ("Lowndes"), appeals from an order denying injunctive relief and damages for the misappropriation by defendants of Lowndes' trade secrets, and for breach of duty of loyalty by certain defendants to Lowndes as employer.

Lowndes is principally located in Easley, South Carolina, where it is engaged in the manufacture of nonwoven textile fabric. This fabric is manufactured by forming a web from fibers such as nylon, rayon or dacron. To this web a liquid bonding agent—termed "latex," "adhesive", or "binder"—is applied. The web is then dried to form the finished product which is used in the manufacture of sanitary napkins, disposable diapers, and other products. The company was founded in 1953 and has experienced remarkable growth, with annual sales today approaching or exceeding $10,000,-000.

In 1969, defendants Claude A. Brower, Billy Loftin, and Ralph B. Stanford, whom we shall call "key employees", left their employment at Lowndes. With the help of defendants Reinhardt N. Sabee, C. Craig Sabee, Lois E. Sabee, and J. Michael Sabee, they organized B. L. S. Corporation. The new company was to manufacture nonwoven fabric in competition with Lowndes. Defendants Harlan Owens, Lewis Owens, Ervin Herrin, Thomas Christopher and Samuel D. Breazeale, Jr.—other "key employees"—also left Lowndes and went to work at B. L. S. The twelve individuals plus B. L. S. Corporation are the defendants sought to be enjoined.

The new corporation commenced its operation in a small shop in Easley. Financial backing by the four defendants Sabee was arranged; a loan was sought through the Small Business Administration. All of the individual defendants participated in the endeavors of the new corporation in some way.

As we consider the appeal we keep in mind the fact that no patents, copyrights, agreements to keep secret, covenants

not to compete, nor contracts of employment for a specific term are involved.

This suit was commenced on August 11, 1969. The complaint alleged that B. L. S. Corporation had been organized to engage in the manufacture of nonwoven fabric by using Lowndes' employees and trade secrets. In addition, the complaint lists a host of unfair and/or unlawful deeds allegedly committed by the individual defendants. A temporary injunction, a permanent injunction, damages, and other relief were prayed for.

A temporary injunction was issued. It forbade defendants' duplication of plaintiff's machinery, processes, techniques and chemical formulations. It enjoined them from divulging information concerning plaintiff's operations.

The case was referred to the Master in Equity for Greenville County for trial on the merits. Hearings consumed twenty-five days. Thirty-one persons were called to testify. Two hundred eight exhibits were offered. The testimony consumed some twenty-eight hundred pages. The master visited the premises of both Lowndes and B. L. S. He issued a report dated May 15, 1970, recommending that all relief sought by Lowndes be denied, that the temporary injunction be dissolved and that the plaintiff be charged with payment of defendants' attorney fees.

Arguments on the exceptions to the master's report were heard by the Honorable Frank Eppes, resident circuit judge. On August 7, 1970, Judge Eppes issued an order affirming the master's report. This appeal is from that order.

The cornerstone of the lengthy complaint in this action seeking to prevent defendants from using plaintiff's trade secrets seems to be paragraph VII:

"VII

"That the processes of manufacturing such non-woven fabrics, the chemical formulations, and the machinery in connection therewith have been developed by the Plaintiff over

a long period of time, and such processes, chemical formulations, and machinery involve *confidential techniques and trade secrets* which are the unique property of the plaintiff; that such trade secrets are known only to the plaintiff and certain of its employees necessarily involved in the development thereof, and Plaintiff has maintained the confidential nature of such trade secrets by prohibiting any examination of its machinery, chemical compounding, and manufacturing processes by outsiders." (Emphasis added.)

The answer denied that defendants acquired confidential knowledge, since any knowledge they acquired was never regarded as confidential, nor were any of the Lowndes processes considered by them to be a trade secret. It also denied acts of disloyalty.

■ The first issue to be determined in every trade secret case is not whether there was a confidential relationship or a breach of contract or some other kind of misappropriation, but whether, in fact, there was a trade secret to be misappropriated. 2 Callman, The Law of Unfair Competition, Trademarks, and Monopolies § 51.1 (3d ed. 1968), herein cited as "Callman".

Comment b to Restatement of Torts § 757 defines "trade secret" as follows:

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. It differs from other secret information in a business in that it is not simply information as to single or ephemeral efforts in the conduct of the business, . . . A trade secret is a process or device for continuous use in the operation of the business. Generally, it relates to the production of goods, as for example, a machine or formula for the production of an article. . . . "

Callman § 52 *et seq.* contains a lengthy treatment of the nature of trade secrets Excerpts are quoted below:

"Almost anything may be in the nature of a trade secret. . . . " [§ 52]

"A trade secret can exist in the unique combination of otherwise known components; although each of its parts, by itself, may be in the public domain, the unified process, design and operation of the combination may be the essence of the secret. . . . " [§ 52.1]

" . . . [A] trade secret need not be essentially new, novel or unique; . . . " [§ 52.1]

" . . . [A]n unique combination of generally known elements or steps can qualify as a trade secret, if it represents a valuable contribution attributable to the independent efforts of the one claiming to have conceived it. The combination must differ materially from other methods revealed by the prior art. . . . " [§ 53.3]

Lowndes has framed six questions on this appeal. The first two are:

"I

"Did the Appellant acquire trade secrets in the course of entering into and developing its nonwoven business?

"II

"Have the Appellees shown a failure on the part of the Appellant to protect its trade secrets which would permit them to copy and use such secrets?"

It is appropriate to here restate this general proposition: Concurrent findings of fact by the master and trial judge will not be disturbed on appeal unless against the clear preponderance of the evidence or without evidentiary support. *Ex parte Gurranty Bank & Trust Co.,* 255 S. C. 106, 177 S. E. (2d) 358 (1970).

A detailed review of the evidence presented would be unnecessarily burdensome to the reader and, under the view we take, would serve no helpful purpose.

The burden of proving the existence of a trade secret falls, of course, upon the plaintiff. Callman § 53.3.

Accepting as the criteria for "trade secrets" those set forth above, we conclude that the lower court should have found that the equipment, formulas and techniques employed by Lowndes brought into being defendable trade secrets.

Appellant's allegation in the complaint:

"That the processes of making such non-woven fabrics, chemical formulations, and the machinery in connection therewith have been developed by the Plaintiff over a long period of time, and such processes, chemical formulations, and machinery involved confidential techniques and trade secrets which were the unique property of the Plaintiff;" has been fully and clearly proven by the prepponderance of the evidence.

However, such does not require reversal of the lower court on the injunctive issue for all trade secrets are not entitled to the protection of a court of equity. "Intent to keep an idea or particular fact secret is the first requirement for protection. . . . Intent will be disregarded, however, if secrecy is not justified, or if the owner's activity renders him undeserving of equitable protection or other requirements are not met. Absence of evidence of proper precautions against publication will sometimes support the conclusion either that a secret or its protection was not intended." Callman § 53.1.

The evidence supports the findings of the master concurred in by the trial judge that Lowndes failed, prior to July, 1969, to take proper reasonable steps to protect its trade secrets.

There is much evidence, indeed voluminous evidence, to the effect that Lowndes' principals, in their own minds, considered that their company's "unique combination" of techniques, etc., constituted protectable secrets. There are isolated instances shown where positive steps were taken to preserve these secrets. But there is also considerable evidence

indicating less than full concern with keeping the system of operation secret.

Lowndes' employees were not required to sign employment contracts containing secrecy agreements. Nor were they required to execute noncompetition agreements. Employees were rarely, if ever, admonished concerning the "secrecy" of Lowndes' processes or equipment, not even upon an employee's termination.

Plant security at Lowndes was, at best, minimal. There was no "sign-in" system or badge system. Doors customarily remained unlocked. A hurricane fence surrounded the plant, but it appears to have been maintained as a deterrent to vandalism rather than as a deterrent to competition. No signs were posted in the plant to remind employees of the alleged secrecy of Lowndes' operations. Upon occasion specifications of equipment or processes appear to have been posted on the walls.

Access to the Lowndes plant appears to have been less than fully restricted. Employees were generally free to "roam" throughout the plant. Supply and maintenance personnel visited frequently and freely. There were instances where actual or potential competitors were given tours of Lowndes' facilities.

As noted above, the testimony which the master heard does reveal isolated steps that were taken to implement secrecy. But, when the evidence is considered in its entirety, it reveals that an attitude of congeniality and accommodation was fostered by Lowndes' management toward its employees and toward outsiders.

"Protecting Trade Secrets", an article in Trial magazine, Vol. 8 No. 1 (January/February 1972, pp. 55-57) is a well-written consideration of the problem. The writer quotes the late Chief Justice Wilkins of the Massachusetts Supreme Judicial Court in *J. T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 260 N. E. (2d) 723 (1970). We too, quote from that opinion:

"A trade secret need not be a patentable invention. 'The fact that an invention is patentable does not compel the taking out of a patent, nor prevent the person entitled to it from keeping it secret.' *Wireless Specialty Apparatus Co., v. Mica Condenser Co. Ltd.,* 239 Mass. 158, 165, 131 N. E. 307, 310. But if the person entitled to a trade secret wishes to have its exclusive use in his own business, he must not fail to take all proper and reasonable steps to keep it secret. He cannot lie back and do nothing to preserve its essential secret quality, particularly when the subject matter of the process becomes known to a number of individuals involved in its use or is observed in the course of manufacture within plain view of others. '[O]ne may not venture on liberties with his own secret, may not lightly or voluntarily hazard its leakage or escape, and at the same time hold others to be completely obligated to observe it.' *Gallowhur Chem. Corp. v. Schwerdle,* 37 N. J. Super. 385, 397, 117 A. (2d) 416, 423. As a naturally known member of the patent bar has written, one who claims that he has a trade secret must exercise eternal vigilance. This calls for constant warnings to all persons to whom the trade secret has become known and obtaining from each an agreement, perferably in writing, acknowledging its secrecy and promising to respect it. To exclude the public from the manufacturing area is not enough." [260 N. E. (2d) at 730, 721]

The totality of the evidence convinced the trial court that Lowndes failed to take the precautions necessary to protect its techniques. Injunctive relief was denied because of such failure. We cannot say that such finding is not supported by the evidence, nor that such is clearly against the preponderance of the evidence.

Question IV submitted to this Court on appeal is as follows:

"Did the Appellees engage in activities which were harmful to the interests of the Appellant and contrary to the duty of loyalty owed to the Appellant by its employees?"

The master made findings as follows:

"I find that the process of planning to leave and going into competition with Lowndes by its former employees generally may have been harmful to Lowndes due to dislocations resulting from loss of their services to Lowndes but that no particular acts could be established or proved which were unlawful. While the persons who left Lowndes constituted an effective team of employees who had been relied upon by Lowndes in large measure for the construction of its print bonders, the resulting dislocations did not prevent Lowndes from effectively functioning. . . . "

We think that his finding that the departure of the employees may have been harmful [and was] and that the employees "constituted an effective team" was correct, but his conclusion that the actions of the employees were not unlawful and their leaving did not prevent Lowndes from effectively functioning was erroneous. Of course, the actions were not unlawful in the sense that one might likely be criminally prosecuted, but we think that their actions were unlawful in the sense that the employees deprived the employer of a right of loyalty and fidelity.

The complaint alleged in essence that Brower, Loftin, Stanford and the four Sabees conspired to take from the plaintiff its trade secrets and lure appellant's employees away in order to secure the further benefit of appellant's trade secrets. It alleged that Brower and Loftin left the appellant's employ without giving notice and induced other employees to go with them, leaving the plant in confusion and without supervision. And further, that Brower as manager of the plant took away or permitted to be taken away valuable and confidential records.

In addition to injunctive relief referred to hereinabove (and denied by the lower court and this Court), the prayer for relief asks:

"5. For compensation in the full amount of all damages sustained by the Plaintiff, payable jointly and severally by

the Defendants, Claude A. Brower, Billy Loftin, Ralph B. Stanford, Reinhardt N. Sabee, C. Craig Sabee, Lois E. Sabee, J. Michael Sabee, and B. L. S. Corporation, together with the costs of this action."

Accordingly, it is seen that over and above the equitable relief sought by the plaintiff, a cause of action is alleged for damages growing out of alleged disloyalty of employees (aided by others) to the appellant employer. It is the contention of the appellant that the lower court should have found damages in its favor on this issue independent of the other phases of the case discussed heretofore. We have held that the appellant's processes, etc., constituted trade secrets and it is inescapable that the same have been used for the benefit of the appellees against whom damages are sought, and to the detriment of the appellant. Injunctive relief was denied solely on the ground (somewhat akin to contributory negligence) that a court of equity will not grant injunctive relief in a case where the owner of the trade secrets did not endeavor to protect itself.

Denial of injunctive relief under the facts of this case is not inconsistent with allowing a claim for damages growing out of disloyalty on the part of employees. An employee has a duty of fidelity to his employer apart from the question whether he has an obligation to maintain the employer's processes and system of operation in confidence. In the absence of an agreement, there is normally nothing wrong with an employee terminating employment and proceeding to compete with his former employer. At the same time, the employee has a duty not to do disloyal acts looking to future competition.

The record is replete with incidents of activities on the part of Brower and Loftin completely inconsistent with promoting the best interest of their employer at a time when they were on its payroll.

R. N. Sabee testified that Stanford contacted him the first part of May, 1969 (about two months before the resigna-

tions) and, "He told me there were two employees of Lowndes Corporation that had definitely decided to leave; they were going to build a plant which would produce nonwovens, and they were offering it for sale of the lease-purchase type." He said that during the last part of May he met with Brower, Loftin and Stanford in Charlotte and at Clemson and discussed the proposed project in detail. His wife, also a defendant in this case, accompanied him on the trip. She wrote a check for $5,000.00 and gave it to Brower to be used in the acquisition of real estate. Within a week or two, Brower phoned Sabee to send $40,000.00 in addition. Deed to the land was taken in the name of Joe Donovan, Sabee's son-in-law, for convenience, and obviously to further the secrecy of their plans.

Brower, Loftin and Stanford (as well as other defendants) were valued employees. Brower was plant manager; Loftin was employed in production and installation of equipment; and Stanford was sales promoter. Stanford left appellant's employ early in 1969. The plant of the appellant closed on the morning of June 28, 1969 for the 4th of July vacation and reopened on Monday, July 7. The defendants, Brower, Loftin, Herrin, Harlan Owens, Lewis Owens and Christopher, did not return to work after the 4th of July vacation. Defendant Breazeale returned and worked July 7, but left the employment of the appellant at the end of that day. On July 7, the work of the defendants began in a rented shop in Easley, to which secretly purchased steel for the copying of appellant's machinery had already been delivered. The work was begun in the name of B. L. S. Corporation, a company organized by Brower, Loftin, Stanford and the Sabees. Application for charter was dated July 7. Brower and Loftin wrote similar letters of resignation, dated June 27 and 28 respectively. They were held until July 5 and mailed to arrive at the offices of the appellant in Philadelphia on July 7.

On the morning of July 7, appellant's operation was thrown into a state of confusion because of an absence of

Brower and Loftin and the other key employees, obviously employed by Brower and Loftin without any warning to the employer. When the plant manager came to know that key employees were going to leave, it became his duty to notify his employer; instead, he lured them away and kept it secret.

We point out one other act of disloyalty on the part of Brower and Loftin. While on Lowndes' payroll, they undertook to go into business with defendant Reinhardt N. Sabee, with whom appellant had a continuing profitable business relationship. Sales were made to Sabee in 1967 totaling $40,-000.00, and 1968 $35,000.00. For the year 1969, it was projected that appellant would sell $50,000.00 worth of material to Sabee. The seller-customer relationship between the appellant and Sabee was destroyed by reason of plans instigated by Brower and Loftin many weeks before the employment was terminated. The connection of Brower and Loftin with Sabee grew out of their employment with the appellant. While under a duty to serve the appellant, they appropriated to their own use a carefully developed business relationship, inconsistent with and detrimental to the appellant.

We are of the opinion that the clear preponderance of the evidence established that both Brower and Loftin breached their duty of fidelity and that the appellant was damaged thereby. Accordingly, we sustain the exceptions addressed to the question set forth above and remand for assessment of damages.

Appellant is entitled to collect all damages proximately resulting from the wrongful conduct of the parties hereinafter named. Because of the view taken by the lower court on all of the issues, little or no attention was given to the appropriate amount of damages to be awarded. The determination of the amount is, of course, for the lower court in the first instance. The amount is obviously substantial. Both parties, on remand, should be allowed to rely upon the record already made and to submit such additional testimony as deemed appropriate to the damages issue.

In its brief, appellant concedes that the claim for sabotage and vandalism cannot be sustained.

On remand, the only issue for determination by the lower court will be what amount of damages should be awarded the appellant. Such amount as is determined shall be against Brower, Loftin, Stanford, R. N. Sabee, Lois E. Sabee, C. Craig Sabee, J. Michael Sabee, and B. L. S. Corporation. The culpability of Brower and Loftin has been indicated above.

The duties and responsibilities of the parties is set forth in 3 Am. Jur. (2d) Agency, Duty Not to Act Adversely, §§ 220, 223, as follows:

"§ 220. Generally; antagonistic dealings for agent's own benefit. . . . An agent is duty bound not to act adversely to the interest of his employer by serving or acquiring any private interest of his own in antagonism or opposition thereto, and this is a rule not only of law but of common sense and honesty as well. In all cases the principal is entitled to the best effort and unbiased judgment of his agent, and an agent is not permitted to assume two distinct and opposite characters in the same transaction—acting for himself and pretending to act for his principal. Indeed, it has been stated that in the usual case, it is the duty of the agent to further his principal's interests even at the expense of his own in matters connected with the agency.

"§ 223. Unfair advantage or secret profit to agent in agency transaction. It is well established that profits made and advantages gained by an agent in the execution of his agency belong to the principal unless the parties themselves have otherwise agreed. In the absence of any agreement to the contrary between himself and his principal, an agent is not entitled to avail himself of any advantage that his position may give him to profit at his employer's expense beyond the agreed compensation for his services. An agent is bound to a high degree of good faith toward his employer, and cannot. without the latter's consent retain profits or earnings

received in the course of performance of the employer's business or in an undertaking which constitutes a breach of duty to the employer. . . ."

Duties and Liability of Third Person to Principal, § 290 as follows:

" § 290. Causing or aiding breach of duty by agent. It is well recognized that a person who without privilege knowingly causes an agent to abandon his duties, or otherwise aids or assists him to violate a duty to his principal, is subject to tort liability to the principal. There are, however, two possible theories of liability, one being that one who knowingly and for his own ends, without justification, procures another to break a contract may be held liable to the other party to the contract for such damage as may accrue on the basis of the interference with the legal rights of another, and the other that the agent's breach of duty to his principal is a tort as well as a breach of contract, and the one procuring such breach is a joint tortfeasor. . ."

There can be no doubt but that Stanford and R. N. Sabee knowingly cooperated with Brower and Loftin, commencing in the month of May and helped to further their disloyalty, and except for such cooperation the damages may not have resulted. Lois Sabee was the wife of R. N. Sabee and came to South Carolina with him and supplied money for purchase of the land. C. Craig Sabee and J. Michael Sabee were sons of R. N. Sabee and they helped to finance the project and were initial directors of the corporation. It is inferable that both the wife and the sons worked with their husband and father as a team in investment matters; their interests were the same. The corporation is in a sense the alter ego of these parties and is the instrumentality through which these parties have profited, all to the detriment of the appellant, and the benefits which have accrued to the individuals now take on the form of corporate assets. These defendants have deposited the benefits in the corporation. The B. L. S. Corporation has profited from the wrongful conduct of the parties that brought it into being and should be held liable along

with the individuals, jointly and severally, for losses which the appellant has sustained.

Our disposition of questions I, II, and IV makes it unnecessary to separately treat questions III and VI set forth in Lowndes' brief. We discuss question V.

The master concluded that attorneys' fees should be awarded to the defendants because Lowndes' claims were, in his words. "goundless, vexatious, and oppressive." The fifth question which Lowndes has framed concerns the propriety of that finding.

To say that the fifth question must be decided in favor of Lowndes because Lowndes was entitled to at least a portion for the relief which it sought would be sufficient disposition of the issue. Such disposition is also required for several other reasons. First, defendants in their pleadings had not asked for an award of attorney fees. Plaintiff was not given an opportunity to meet the issue. The master apparently reached this conclusion of his own volition, without notice to either party.

Upon receipt of the master's report counsel for Lowndes sought to have the matter recommitted for consideration of this issue. The motion was denied. The trial judge thus perpetuated the master's error.

It is often difficult to define "due process." But it is not difficult for attorneys and judges to agree that if due process means anything, it means that a litigant must be given an opportunity to meet an issue before an adverse determination is made. The action was not vexatious in the legal sense, but we think the trial was unnecessarily long; such was perhaps brought by one litigant as much as the other. Both the master and the circuit judge erred in ruling that defendants' attorneys should be paid by the Plaintiff.                                ,

In summary, we hold that the lower court order refusing to grant an injunction should be affirmed; we reverse in

part and hold that Lowndes is entitled to damages to be assessed against those defendants named hereinabove; we hold that the lower court erred in directing that Lowndes pay defendants' attorney fees and costs.

The case is remanded to the lower court for the purpose of having that court determine the amount of damages to which Lowndes is entitled and judgment shall be awarded accordingly.

Affirmed in part; reversed in part.

BUSSEY, J., not participating.