GREGORY, Circuit Judge,
dissenting in part:
This case is about just compensation for an inventor of a marketing scheme who was later cut out of the deal by two entities that had a long-standing relationship with each other: Verizon and its advertising agency of record, Erwin-Penland (“EP”). The majority takes the case away from the jury, concluding that no rational trier of fact could find the inventor, Greenfield, had taken efforts reasonable under the circumstances to protect the scheme’s secrecy. Such a conclusion is premature. There is a rich record with details pointing in both directions regarding Greenfield’s efforts to protect his ideas, with both copyright and confidentiality notices, including one that was specifically removed by EP without Greenfield’s permission, that indicates while the arguments in his favor may ultimately be overcome, a jury should at least have been allowed to view his efforts.
There are three additional points that the majority overlooks. First, the majority ignores a proposition advanced by the very treatise it cites: that disclosure to prospective clients in the advertising context does not necessarily vitiate secrecy, but rather may, in fact, be reasonable. Second, the majority assumes without record support that other advertising agencies were competitors. These agencies may well have been collaborators whose roles were to take over portions of the plan that could not be executed by EP and 1st Approach, meaning their presence is a fact the jury has a right to consider and ultimately discount. The majority thus skews this fact in the light most favorable to the movants. Finally, the argument that Greenfield disclosed some secrets to Captain D’s is irrelevant because these were not the same secrets presented to Verizon, in particular they did not include the so-called Pastor Packet, which was an idea unique to the proposal drafted for the wireless giant. For these reasons, I respectfully dissent as to the trade secret cause of action. I concur in the remainder of the majority’s opinion, and do not discuss it here.
I.
Unless otherwise noted, all of the following facts are uncontested. I relate them here because there are several important points that the majority omits.
Jeffrey Greenfield is the sole employee of two marketing companies, 1st Approach and Buzznations. These companies specialize in branded entertainment: the combination of a brand with a live event synthesized with internet strategies, word-of-mouth, grassroots “buzz” marketing, and traditional print and broadcast media. In addition to being the principal at both companies, he gives lectures around the country. At one of his lectures, he met Joseph Erwin, the president and founder of EP, a regional advertising agency located in Greenville, South Carolina.[1] After hearing his talk about branded marketing, Erwin approached Greenfield and suggested that the two collaborate.
*220 1st Approach and EP pursued an account with Captain D’s, a seafood restaurant chain primarily located in the South, to be what is known in the industry as the “agency of record.” There is hot dispute over who first originated the concept,[2] but the two parties agree that the advertising campaign to Captain D’s centered around the production of a marketing campaign called “Amazing Grace,” after the hymn. The campaign was designed to be a reality television series modeled on the show American Idol in a competition for the best church choir in America.
There was no non-disclosure agreement (“NDA”) between the parties. Nevertheless, the two had extensive collaboration including conference calls, meetings, and materials sharing. The information Greenfield transmitted to EP, in the form of PowerPoint slides as part of a presentation “deck,” was under explicit confidentiality provisions. Specifically, the disclaimer on the slides presented to Captain D’s read: “[t]he ideas and concepts contained within this document are the sole and confidential property of 1st Approach, LLC and will not be shared with any other agency or utilized without prior written consent.” J.A. 1375.
After Captain D’s turned down the bid, 1st Approach and EP decided to market it elsewhere. EP was the ad agency of record for Verizon. Verizon was EP’s top revenue-generating client and had been for some number of years. EP had initial discussions with Verizon about potentially developing the “Amazing Grace” concept, which later became known as “How Sweet The Sound” (“HSTS”), after the second line of the song, for the wireless company. Verizon was trailing its competitors in the African American community, with only 17% of market-share as opposed to 25% overall, and needed a marketing strategy to reach this demographic.
When EP initially presented the HSTS idea in December 2005 to Verizon, it labeled the idea “Confidential and Proprietary Material by [EP].” J.A. 1577. Like the Captain D’s disclaimer, the material read “[u]se, disclosure or distribution of this material is not permitted to any unauthorized persons or third parties except by written agreement.” Id. The regional Verizon employees passed on the information to Verizon’s Chief Marketing Officer, Stratton, without the knowledge or consent of Greenfield.
After the December 2005 pitch, in which Greenfield did not participate, EP followed up with an April 2006 presentation. The contents of this presentation, a 30-plus PowerPoint slide deck, lie at the heart of the dispute, because Greenfield concedes in his deposition that the trade secrets in question were contained therein.[3] As part of the presentation, Greenfield came up with numerous ideas he claims were trade secrets including tax strategies and the so-called Pastor Packet, which was a direct mailing bundle sent to church preachers and choir directors that could be used to *221 rope their congregations into signing up for Verizon subscriptions. Importantly, these secrets differ markedly from the information that was submitted to Captain D’s, both in kind and in quantity, with the Pastor Packet being the most obvious example.
In the lead up to the April 2006 presentation, Greenfield and EP exchanged many emails and also participated in numerous conference calls with each other. On March 13, 2006, Greenfield drafted a budget that he sent to EP detailing the projected costs of HSTS. Verizon ultimately did not rely upon this budget — it went with a scaled-down version of the idea— but it did pick up the HSTS program and execute it in Memphis, Tennessee as a test market. The parties did not discuss what would happen if Verizon did not accept the deal, or as here accepted it, but in modified form. Greenfield, however, registered his idea with the Writer’s Guild of America on February 15, 2006, with ownership vested in himself and EP.
At the April 2006 presentation to Verizon, Greenfield spoke only briefly, for as short as five minutes, and the people at Verizon do not remember him independently of this lawsuit. Nevertheless, the “deck” identified him and 1st Approach as the co-creators of the HSTS idea and included a copyright notice from EP and 1st Approach. At the meeting, at least one other advertising agency was present and possibly more. The deck was not marked “confidential.” The record does not specify whether the advertising agencies were competitors or potential collaborators to 1st Approach or what the relationship was between Verizon, EP, and the agency or agencies. See J.A. 494-500 (discussing the role of the respective advertising agencies). None of the people from advertising agencies or other attendees at the meeting were asked to sign a confidentiality agreement.
Greenfield was ultimately cut out of the process after the April 2006 pitch. In the two-month period following the presentation, he worked with EP to fine tune the proposal, scaling it back to reduce the television aspect since Verizon determined that aspect was not within its “core competency.” On June 9, 2006, Greenfield participated in a conference call with EP in which Erwin affirmed the “partnership.” The parties agreed that Greenfield would have to downsize the proposal to fit Verizon’s needs. On June 19, 2006, Greenfield submitted his final work-product to EP, reducing the cost of the budget to $5.4 million. On November 22, 2006, Greenfield wrote to EP and asked whether Verizon had approved or turned down HSTS and said that if they had turned it down, he would like to shop around the idea to other potential clients. Allen Bosworth of EP responded by saying that the idea was “still being looked at” by Verizon and that Yahoo! Music was very interested in the deal. J.A. 1598. After that, Greenfield emailed EP on January 26, 2007, March 29, 2007, and July 26, 2007, but EP failed to respond.
EP claims that the reason it ceased to do business with Greenfield is because he was the “television man”; that if Verizon decided it did not want to do that component of the advertising campaign, then it could simply eliminate him. However, the record shows that Verizon did adopt a proposal that was strikingly similar to Greenfield’s original idea. Specifically, in conjunction with EP and other advertising agencies, Verizon in both 2008 and 2009 produced eleven events and a final competition, a one-hour documentary film, and a one-hour televised finals competition that aired on the Gospel Music Channel. According to Greenfield, the marketing cam *222 paign has been a financial boon to both Verizon and EP, substantially creating inroads into the African American community. The campaign for HSTS ultimately received an Effie Award, essentially the equivalent of an Oscar within the advertising community. EP also received trademark registration for HSTS.
II.
There are three important inquiries that must be decided. First, as a threshold matter, is there a trade secret? Second, if there is a trade secret, was it adequately protected? Third, if it was adequately protected, was it improperly taken? The first inquiry, one that is assumed though not decided by the majority, is whether Greenfield has a protectable interest to begin with under South Carolina Code § 39-8-20(5). Because the answer is not clearly established, I would certify it for the South Carolina courts.
The Act defines trade secret to include “a formula, pattern, compilation, program, device, method, technique, product, system, or process, design, prototype, procedure, or code.” S.C.Code Ann. § 39-8-20(5)(a). It goes on to specify that:
[a] trade secret may consist of a simple fact, item, or procedure, or a series or sequence of items or procedures which, although individually could be perceived as relatively minor or simple, collectively can make a substantial difference in the efficiency of a process or the production of a product, or may be the basis of a marketing or commercial strategy. The collective effect of the items and procedures must be considered in any analysis of whether a trade secret exists and not the general knowledge of each individual item or procedure.
Id. at (5)(b). Although there is little to no caselaw on the issue, it appears from the statute’s text that a marketing strategy that consists of disparate ideas woven together can be a trade secret.
Verizon argues that there is nothing protectable contained in the April 2006 slides. Specifically, Verizon claims that because the individual elements of the trade secret are in the public domain there is no trade secret. The district court seemed to agree with this proposition, holding that “[tjhe concepts themselves are generalized principles that are well-known in the advertising and marketing industries and are readily ascertainable by others.” J.A. 165-66. However, neither Verizon nor the district court cited any authority to support their proposition that because some elements of a marketing strategy are public, their “collective effect” cannot constitute a trade secret.
Both the text of the statute as well as what little law exists on the topic seem to go in the opposite direction. That is to say, even if elements of the trade secret are public, if the particular alchemy behind the item as a whole is not, then it is considered protectable. Greenfield uses the analogy of a Mrs. Fields cookie; general recipes for chocolate chip treats are common, but the recipe specific to Mrs. Fields is still considered a trade secret. Several cases support his point. See, e.g., Lowndes Products, Inc. v. Brower, 259 S.C. 322, 328, 191 S.E.2d 761 (1972) (“A trade secret can exist in the unique combination of otherwise known components; although each of its parts, by itself, may be in the public domain, the unified process, design and operation of the combination may be the essence of the secret.”); Servo Corp. of Am. v. General Elec. Co., 393 F.2d 551, 555 (4th Cir.1968) (a litigant may not “avoid the consequences of the breach of confidence by piecing together in retrospect bits of information which had been disclosed in a variety of places and which as a combination were not clearly a matter *223 of public knowledge.”); Elizabeth Carpenter, 20 S.C. Jur. Intellectual Property § 74 n. 3 (2010) (collecting cases); Louis Altman & Malla Pollack, 2 Coliman on Unfair Competition, Trademarks, and Monopolies § 14:22 (2008) (“The internal facts of a business ... [t]he subject matter is not necessarily new, novel or unique; it may be something which, when connected with a known factor, may be so valuable to a business that its continued concealment from others is of paramount importance.”). However, general business know-how is not protected. Altman & Pollack, supra, § 14:22. Similarly, marketing strategies that are commonly employed are not protectable. Id.[4]
Greenfield alleges that the particular combination of his marketing plan, with judges selecting the best choirs after they submit short segments, text message voting, and audience participation, constituted the essence of his secret. Even though there are particular elements that are within the public domain, there are kernels of ideas that are both original and unknown, and as a result not readily ascertainable by proper means. Specifically, the idea of the Pastor Packet — which was utilized by Verizon to outreach to ministers and choir directors — is an idea original to Greenfield that was ascertainable only through his private presentation. Thus, while in retrospect some of these ideas may be self-evident, at the time they were created they were not.
More importantly, however, even if we were to conclude that the April 2006 presentation contained no trade secrets because the individual elements were “readily ascertainable,” the existence of a trade secret is generally one of fact left to the jury, not for the judge, though a few courts consider the issue to be a mixed question and a small minority consider it to be an issue of law. Louis Altman & Malla Pollack, 2 Coliman on Unfair Competition, Trademarks and Monopolies § 14:27 ns.61-63 (Supp.2010-2) (collecting cases). South Carolina has not weighed in on the issue and there are no cases that I have uncovered from this jurisdiction addressing the point. I would thus certify the issue to the South Carolina courts.
III.
The next question is whether Greenfield took adequate steps to protect his trade secret. The district court granted summary judgment on the basis that Greenfield failed to adequately protect his secrets because he disclosed them at a business pitch to Verizon and the business pitch included third-parties: other advertising agencies whose role in the process is unspecified. The majority agrees and concludes that no reasonable jury could find otherwise. I disagree. It is striking to me, for instance, that Greenfield did place confidentiality notices on his materials — notices that were only subsequently removed by EP. I do not believe that EP’s unilateral actions should vitiate efforts to protect secrecy nor that a reasonable jury should be foreclosed from agreeing.
Under South Carolina law, the owner of a trade secret must show that she or he made “efforts that are reasonable under the circumstances to maintain its secrecy.” S.C.Code Ann § 39-8-20(5)(a)(ii). Thus, “[o]ne may not claim as a trade secret information ‘completely disclosed by the goods one markets’ ” or “information that *224 has been disclosed to the public in a way which makes ‘the “secret” so obvious as to render meaningless’ any claim of confidentiality.” Carpenter, supra, at § 74. Nevertheless, “courts have recognized that some disclosure is necessary for enjoyment of the benefits of a trade secret and that not every disclosure effectively destroys secrecy.” Id. A quintessential example of protected disclosure is a pitch to potential customers. Id. at n. 7 (citing ILG Indus., Inc. v. Scott, 49 Ill.2d 88, 94, 273 N.E.2d 393 (1971)). Most importantly, like the question of whether or not a trade secret exists as a threshold matter, the question of adequate protective measures is, at least under Fourth Circuit caselaw, one of fact. Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d 655, 664 (4th Cir.1993) (analyzing a Maryland law that, for our purposes, is identical); Altman & Pollack, supra, § 14:26, n. 27 (collecting cases). Indeed, it is a rare case where summary judgment should be granted on this issue because “the answer depends on a balancing of costs and benefits that will vary from case to case and so require estimation and measurement by persons knowledgeable in the particular field of endeavor involved.” Rockwell Graphic Systems, Inc. v. DEV Industries, Inc., 925 F.2d 174, 179 (7th Cir.1991). Factors that should be considered by a jury in evaluating secrecy include, according to the Restatement of Torts:
(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business;
(3) the extent of measures taken by him to guard the secrecy of the information;
(4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.
Restatement (First) of Torts § 757, cmt. b (1939).
In the instant matter, these factors suggest that there was enough of a track record for the jury to be able to hear the case. First and foremost, the pitch was not open to the general public; it was a closed setting and the information was thus not known outside the business. While it is true other advertising agencies may have been there, the precise nature of the relationships is not fleshed out by the record. Indeed, it is a fact that can be spun in many directions, and, according to summary judgment standards, deserves to be construed in Greenfield’s favor. These agencies may or may not have been competitors looking to poach the idea from EP and 1st Approach, or they may have been collaborators that would be brought in to handle parts of the deal that were beyond the competencies of EP and 1st Approach. They may have been agents of Verizon, and they may have had contractual relationships with EP. To rest the entire decision on this point seems to me a thin reed indeed. I think it would be far better to allow the jury to weigh and consider this in addition to other evidence at trial.
The majority also makes much of the disclosure to Captain D’s, but there are two responsive points. First, as stated above, disclosure to potential customers is a protected activity. Second, the content of the secrets that were disclosed to Captain D’s differs from the content of the trade secrets — in particular the Pastor Packet — that made up the idea Greenfield claims Verizon misappropriated. Thus the majority seems to be comparing apples to oranges.
Next, even if the other advertising agencies or Captain D’s were competitors as the majority simply assumes without sup *225 port, the deck said that it was copyrighted to EP and 1st Approach. 1st Approach also had confidentiality notices on materials. J.A. 910; J.A. 941; J.A. 1061-64; J.A. 1186; J.A. 1875 (including information that was in talks and Captain D’s pitch and confidentiality notices from EP on their own behalf). Indeed, the confidentiality notices that were lacking on the final deck were, according to Greenfield, removed without his consent. (Appellant’s Br. at 36-37.) I do not believe that it is appropriate to hold that EP’s unauthorized and unilateral efforts vitiate Greenfield’s protective efforts or render them insufficient as a matter of law.
While a business pitch may be “speculative,” at least according to Verizon and EP, it arguably does not allow the customer to appropriate the ideas in the pitch without paying for them. Any disagreement over the function of business sales, and precisely how confidential they are intended to be and actually were, is further justification for vacating summary judgment and allowing the matter to go to trial.
The contractual relationship between Verizon and EP also militates against the degree of disclosure necessitated; because the two companies had a very close working relationship and Verizon was EP’s biggest client, it is within the purview of the jury to find that secrets might fall within their legal relationship. More specifically, the jury could determine an expectation of secrecy was part of the overall relationship between the two companies. See, e.g., Burten v. Milton Bradley Co., 763 F.2d 461, 463 (1st Cir.1985) (“A confidential relationship generally arises by operation of law from the affiliations of the parties and the context in which the disclosures are offered ... a confidential relationship typically will be implied where disclosures have been made in business relationships between employers and employees, purchasers and suppliers, or prospective licensees and licensors.”) (internal citations omitted).
Furthermore, the fact that Greenfield himself kept the idea for the series a secret is telling. He waited after being assured that Verizon was still considering the pitch instead of taking it to other potential customers, suggesting he viewed the matter as both secret and proprietary.
Finally, Verizon points to the fact that there was no NDA as an example of why Greenfield failed to take reasonable efforts to protect his material. I strongly caution against placing too much reliance on the existence of an NDA. While indicative of secrecy, it is no talisman. Altman & Pollack, supra, § 14:26 (noting four factors, of which an NDA is only one). Indeed, according to the treatise on South Carolina law cited by the majority, a confidential relationship may be implied from the circumstances of the disclosure rather than be in the form of an express agreement, as mentioned previously. Carpenter, supra, at § 76 (“Written agreements are not, however, essential to protect secret information disclosed to employees or others in every case. The required agreement may be implied by the confidential relation itself.”). Thus, I believe there are enough facts for a jury at least to be able to evaluate this issue for itself.
IV.
Last, there is the question as to whether the secret was indeed misappropriated if it did exist in the first place. The district court held that it was not; even if the materials were confidential, it ruled, it had not been acquired by “improper means.” Under South Carolina law, “improper means” means “theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, duties imposed by the common law, stat *226 ute, contract, license, protective order, or other court or administrative order, or espionage through electronic or other means.” S.C.Code Ann. § 39-8-20(1) (emphasis added). The district court ruled that because Verizon did not consider the material confidential, a fortiori it could not have been acquired through improper means. I disagree. Verizon knew that Greenfield had a role in formulating the marketing strategy, as evidenced by 1st Approach’s inclusion in the 2006 deck, and a reasonable jury could find that Verizon intentionally induced EP to breach its duty of secrecy and cut him out from the deal. This is true regardless of whether or not key Verizon officials knew specifically who Greenfield was.
V.
For the foregoing reasons, I affirm in part and dissent in part.

. EP was purchased by Hill Holliday Connors Cosmopulos, Inc., a national advertising agency that is owned by Interpublic Group.

. Greenfield testifies that it was his idea to have the gospel choir competition. In contrast, Erwin testifies that someone on his team — who used to be a political operative in the democratic South- — had the idea of using churches and faith-based singing to bring the communities together.

. Greenfield's reply brief alleges that there were trade secrets beyond what were contained in the April 2006 pitch at which other advertising agencies were present. (Appellant's Reply Br. at 27.) It is theoretically possible, then, that some of the secrets may not have been adequately protected, whereas others were. The majority does not consider this point. I need not express an opinion on their scope, however, as there are enough facts on this record for a jury to be able to consider the secrets even if they are limited to the April 2006 deck.

. It is also important to note that South Carolina has no "novelty” requirement, unlike other jurisdictions such as New York and California that require the combination to be new, much like a patent, must not be "obvious.” The district court seemed to impose just such a requirement, but I find that to be unsupported by South Carolina law.