PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

CARL STEPHEN MOSELEY,

    *Petitioner-Appellant,*

    v.

GERALD J. BRANKER, Warden,
Central Prison, Raleigh, North
Carolina; NORTH CAROLINA
ATTORNEY GENERAL,

    *Respondents-Appellees.*

No. 07-17

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
N. Carlton Tilley, Jr., District Judge.
(1:97-cv-01239-NCT)

Argued: September 23, 2008

Decided: November 3, 2008

Before TRAXLER, SHEDD, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge Traxler wrote the opinion, in which Judge Shedd and Judge Duncan concurred.

## COUNSEL

**ARGUED**: Paul MacAllister Green, Durham, North Carolina, for Appellant. Valerie Blanche Spalding, NORTH CARO-

LINA DEPARTMENT OF JUSTICE, Capital Litigation, Federal Habeas Corpus Section, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Jonathan E. Broun, CENTER FOR DEATH PENALTY LITIGATION, Durham, North Carolina, for Appellant. Roy Cooper, Attorney General of North Carolina, Raleigh, North Carolina, for Appellees.

## OPINION

TRAXLER, Circuit Judge:

Carl Stephen Moseley was convicted by a North Carolina jury of the capital murder of Deborah Henley and sentenced to death. After unsuccessfully challenging his conviction and sentence on direct appeal and in state post-conviction proceedings, Moseley filed a petition for writ of habeas corpus in federal district court. *See* 28 U.S.C.A. § 2254 (West 2006). The district court denied relief. We granted a certificate of appealability, pursuant to 28 U.S.C.A. § 2253(c)(1) (West 2006), to consider a claim raised by Moseley under *Brady v. Maryland*, 373 U.S. 83 (1963). Because the North Carolina Supreme Court's disposition of Moseley's *Brady* claim was neither contrary to, nor an unreasonable application of, clearly established federal law, as determined by United States Supreme Court precedents, we now affirm.

### I.

### A.

Deborah Henley was a 38-year-old petite woman with a speech impediment who lived with her mother in the Old Town section of Winston-Salem, North Carolina. On Thursday evening, July 25, 1991, Henley's sister dropped her off at the SRO Club, a local dance club in Winston-Salem. According to her mother, Henley had approximately eight dollars with her when she left for the club.

Appellant Carl Moseley and two of his friends, Travis Key and Tony Casstevens, also frequented the SRO Club and were there that evening. Moseley and Key had spent most of the day together and had thoroughly washed Key's car, inside and out. Moseley then borrowed Key's car to go home and get ready to go to the club. Key later rode to the club with another friend, where he met Moseley and Casstevens about 9:00 p.m.

When the club closed at approximately 1:30 a.m., Henley went outside and asked Duane Shouse for a ride home, but he was unable to help her. An employee of the club offered to let Henley use the telephone, but Henley declined. According to several witnesses, Henley was instead telling patrons that she would pay $50 for a ride home. Moseley, Key, and Casstevens were also outside the club at the time. Key saw Henley talking to Shouse and, later, to Moseley. A few minutes later, Moseley approached Key and asked to borrow Key's car to take Henley home. Moseley told Key that Henley had offered to pay him $50 for the ride and that he would split the money with Key. Key initially resisted, but finally agreed. Key and Casstevens saw Henley get into Key's car with Moseley and drive away at approximately 1:40 a.m. Henley never arrived home.

Key and Casstevens stayed behind at the club to wait for Moseley to return with Key's vehicle. Based upon where Moseley said Henley lived, they expected Moseley to return in approximately 15 to 30 minutes. When Moseley did not return for more than an hour, the two men left the club in Casstevens' vehicle. As they were driving, they saw Moseley coming towards them in Key's vehicle. Moseley was alone. Both vehicles pulled over and the men got out. When Key asked Moseley where he had been, Moseley told the men that "the damn bitch didn't live where she said she did." J.A. 883. Moseley told the men that she lived on the other side of King, North Carolina, presumably to explain his delay. That statement was untrue, but even if it had been true, the additional distance did not explain the inordinate delay in Moseley's

return. In addition, Moseley told the men that Henley did not have any money. A law enforcement officer who happened by the area witnessed the three men standing beside the road and briefly stopped to ask if there was a problem. After taking Moseley home, Key returned to his home and went to bed. The next morning, Key noticed a small amount of dirt and weeds on the floorboard of the driver's side of his vehicle. As noted previously, Key's car had been thoroughly washed just before Moseley drove it to the SRO Club the previous evening.

On Friday evening, Tommy Beroth, a property owner in a rural area of Forsyth County, discovered Henley's body partially hidden under cut corn stalks in his cornfield. The cornfield was approximately five miles and a nine-minute drive from the SRO Club and within one mile of Henley's home. There was testimony that Moseley had travelled the roads near the cornfield in the past and, therefore, was presumably familiar with them. Henley was completely naked, and her clothing was never found. She had been brutally beaten about the head, face, neck, chest, and abdomen, sexually assaulted with a blunt instrument, stabbed twelve times in the chest, tortured by means of two long incisions on her chest and two more across her neck, and manually strangled. A single dark hair was found underneath one of her fingernails. There was no spermatozoa or semen detected.

The following day, Moseley called both Casstevens and Key and asked them not to tell anyone that he had been at the SRO Club on Thursday night because he was on probation and was not supposed to be drinking alcohol in such environments. Key and Casstevens, however, had been to clubs with Moseley before and Moseley had never previously made such a request. When Casstevens pointed out to Moseley that his name would be on the sign-in sheets at the SRO Club, Mose-

ley told Casstevens that he had gone to Nancy Bolt's house that evening and that she would be his alibi.[1]

Aware by that time of rumors that a woman had disappeared from the SRO Club on Thursday night, Casstevens and Key contacted the police. The police obtained search warrants and retrieved the clothing that Moseley was wearing that evening at the SRO Club, as well as two pocket-knives among his possessions. Traces of blood were present on Moseley's boots, shirt, and jeans, indicating secondary transfer or spattering, but the quantities were insufficient to determine the origin. A pathologist testified that the size and shape of the wounds inflicted on Henley were consistent with the two knives seized by authorities. Although there was conflicting testimony from Moseley's soil expert, the state's soil analyst found the soil on Moseley's boots to be consistent with soil samples taken from the crime scene.

### B.

During the trial, the prosecution was allowed to present evidence of Moseley's alleged involvement in the similar rape and murder of Dorothy Woods Johnson, whose body was found in adjoining Stokes County, North Carolina, approximately three months before Henley was murdered.

Dorothy Johnson was also last seen alive at the SRO Club. She was 35 years old, petite, and also suffered from a speech impediment. On the evening of April 12, 1991, she drove to the SRO Club where she met her friend Sherry Hoss and Hoss's then-boyfriend, Dexter Mabe. During the evening, two

---

[1]Nancy Bolt was also at the SRO Club on the evening of July 25, 1991, where she made plans to meet Moseley later at her home. When Moseley arrived at her home about 3:15 a.m. the following morning, Bolt saw no blood on his clothing or cuts on his body. However, she testified that she was not with Moseley from midnight until his arrival, and that she had expected him to arrive earlier.

witnesses at the club saw Johnson dancing and talking with Moseley, whose name appeared on the SRO Club's sign-in sheets. Moseley was wearing a cowboy hat and dark jeans. Hoss and Mabe left the club around 11:00 p.m. and walked to a nearby motel where they stayed for the remainder of the night. Johnson was still at the SRO Club when they left.

Johnson's nude body was later found in a rural area called Friendship Forest. She had multiple blunt force injuries to her head, neck, chest, abdomen, and body, and had been sexually assaulted. Spermatozoa and semen were present on vaginal and rectal smears. The semen was estimated to have been deposited within twelve hours of Johnson's death. Johnson had a single black hair underneath one of her fingernails. Johnson's car and her purse were left at the SRO Club. Pam James, a former girlfriend of Moseley, testified that she and Moseley would sometimes drive to the Friendship Forest area, near where Johnson's body was found, to have sexual relations. A resident of the area, and acquaintance of Moseley and James, testified that Moseley had once questioned her and her husband about their property and remarked that it would be a good place to leave a body because it would take days before it would be found.

During the initial investigation of Johnson's murder, law enforcement identified Dexter Mabe, Daniel Cannaday, and several other men as possible suspects. Mabe had dark hair, was dating Hoss at the time of the murder, was present at the SRO Club that night, and had been involved in disagreements with Johnson about his relationship with Hoss in the past. Cannaday was Johnson's former boyfriend and was known to have been possessive and jealous of Johnson before he ended his relationship with her. However, both men were ultimately eliminated as suspects. DNA samples obtained from both men did not match the DNA samples retrieved from Johnson's body and each man had provided an alibi for the evening.

The DNA profile from semen found in Johnson did, however, match Moseley's DNA profile, which was obtained after

Key and Casstevens alerted authorities that Henley had left the SRO Club with Moseley on the night Henley was murdered. As noted previously, Moseley was seen dancing and talking to Johnson on the night of Johnson's murder. According to Michael Budzynski, of the DNA Unit of the State Bureau of Investigation, the chance that Moseley was not the donor of the semen found in Johnson was approximately one in 274 million.

There were striking and obvious similarities between the murders of Johnson and Henley, indicating a common killer. Johnson and Henley were both last seen alive at or leaving the SRO Club. Henley was with Moseley when she left the SRO Club and Johnson was seen in the company of Moseley near the time of her disappearance. The women were of similar age and had small physical builds. Henley was 38 years old, approximately 5′4″ tall, and weighed approximately 105 pounds. Johnson was 35 years old, approximately 5′6″ tall, and weighed approximately 82 pounds. And, both women suffered from speech impediments.

The nature and extent of the victims' injuries and the causes of their deaths were also similar. As discussed in more detail below, both women sustained multiple blunt force injuries to their head, neck, chest, abdomen, and body, and had defensive injuries. Both women had also been sexually assaulted with a foreign object, tortured, and strangled. In addition, both women were found completely naked in rural areas where Moseley was known to have traveled. Both women had dirt around their fingernails, both were barefoot, and both had ground-in dirt on the soles of their feet. An FBI witness testified that the signature to each crime was overkill —the murderer inflicted far more injuries to the victims than necessary to cause death and employed multiple means of death, any one of which would have been alone sufficient.

The evidence regarding Johnson's murder was admitted in the Henley murder trial pursuant to Rule 404(b) to show iden-

tity of the perpetrator, the existence of a similar modus ope-
randi, intent, and design. *See* N.C. Gen. Stat. § 8C-1, Rule
404(b) ("Evidence of other crimes, wrongs, or acts . . . may
. . . be admissible for other purposes, such as proof of motive,
opportunity, intent, preparation, plan, knowledge, identity, or
absence of mistake, entrapment or accident.").[2] Clearly, there
was evidence from which the jury could find that the murders
were committed by the same person. Moseley offered no evi-
dence that excluded him as the murderer of either woman,
arguing primarily that the DNA evidence was not reliable and
that, even if it was, it only proved that Moseley had sexual
relations with Johnson in the hours immediately prior to her
death. He argued that the killer was an unknown dark-haired
man.

## II.

Moseley was ultimately convicted by the jury of the first-
degree murder of Henley, and the capital sentencing hearing
commenced. As additional evidence in support of a prior fel-
ony conviction aggravator, the state presented evidence of a
1990 conviction of Moseley for assault with a deadly weapon
inflicting serious injury and the attempted second-degree rape
of Laura Fletcher. Fletcher met Moseley in June 1989 and
agreed to go for a ride with him. Moseley drove Fletcher to
a secluded road in a rural area and began to kiss and touch
her. When Fletcher resisted, Moseley took a gun from the
glove box and ordered her to completely disrobe. Moseley

---

[2]Johnson was murdered three months before Henley. However, Moseley
was not arrested or charged in Johnson's murder in Stokes County until
after Moseley was arrested and charged in Forsyth County for the Henley
murder. Thus, Moseley was tried and convicted first for the second mur-
der. Moseley was later convicted of the first-degree murder, first-degree
sexual assault, and first-degree rape of Johnson, and again sentenced to
death. The circumstances underlying Johnson's killing are set forth in
*North Carolina v. Moseley*, 449 S.E.2d 412 (N.C. 1994). A federal habeas
petition arising out of that case is currently pending in the federal district
court.

also completely disrobed and ordered Fletcher to perform oral sex. When she refused, Moseley grabbed her head and attempted to force compliance. When she again pulled away, Moseley pointed the gun at Fletcher's head. A struggle ensued and the gun went off, injuring Fletcher's hand. After she was injured, Moseley took Fletcher home but, anticipating that she would contact the police and despite the fact that he had already told her his real name, gave her a false name in the hopes that she would report the latter instead.

In mitigation, Moseley called a former teacher, who testified as to Moseley's good performance as a school bus driver, and several family members and friends, who attested to a good, loving home environment and a personal character on the part of Moseley that was, in their opinion, inconsistent with his having committed such an egregious crime.

At the conclusion of the sentencing hearing, the jury recommended a sentence of death, based upon the following aggravating circumstances: (1) that Moseley had a previous felony conviction involving the use or threat of violence; (2) that the murder was committed while Moseley was engaged in the commission of first-degree rape or a first-degree sex offense; and (3) that the murder was especially heinous, atrocious, or cruel. The only mitigating circumstance found by one or more jurors was that Moseley was cooperative during his arrest and provided assistance to law enforcement during the search of his bedroom. The North Carolina Supreme Court affirmed the conviction and imposition of the death sentence, and the United States Supreme Court denied certiorari. *See State v. Moseley*, 445 S.E.2d 906 (N.C. 1994), *cert. denied*, 513 U.S. 1120 (1995).

Moseley initiated state post-conviction proceedings in April 1996, by filing a motion for appropriate relief ("MAR") with the state court. The MAR was initially denied without a hearing, and the North Carolina Supreme Court denied certiorari. However, in November 1998, the North Carolina Supreme

Court remanded the case for reconsideration of the MAR in light of a change in state law governing capital cases in post-conviction proceedings, which entitled Moseley to discovery. *See* N.C. Gen. Stat. § 15A-1415(f).**³** Moseley subsequently filed an amended MAR, raising, *inter alia*, a claim that discovery had produced a number of documents from the Johnson murder investigation that had not been produced to the defense in the Henley murder trial, in violation of the state's obligation under *Brady v. Maryland*.

In October 2000, the state MAR court conducted an evidentiary hearing on the claims and heard testimony from many of the witnesses who were interviewed during the Johnson murder investigation. On March 26, 2001, the state MAR court denied all claims. The North Carolina Supreme Court denied certiorari, as did the United States Supreme Court.

In the meantime, Moseley initiated federal habeas proceedings by the filing of his § 2254 petition, but the matter was held in abeyance to allow Moseley to pursue discovery in the remanded state MAR proceedings. After the state denied his MAR request, Moseley returned to the district court with an amended § 2254 habeas petition as well. The magistrate judge issued a report and recommendation that the amended petition be denied. The district court agreed and issued an opinion denying relief. The district court also denied Moseley's Rule 59(e) motion. We subsequently granted a certificate of appealability to consider Moseley's *Brady* claim.

---

**³**Pursuant to § 15A-1415(f), "[i]n the case of a defendant who has been convicted of a capital offense and sentenced to death, . . . [t]he State, to the extent allowed by law, shall make available to the capital defendant's counsel the complete files of all law enforcement and prosecutorial agencies involved in the investigation of the crimes committed or the prosecution of the defendant." N.C. Gen. Stat. § 15A-1415(f).

III.

In *Brady v. Maryland*, the Supreme Court ruled that the prosecution's failure to disclose "evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In order to prevail on a *Brady* claim, the accused must prove (1) that the undisclosed evidence was favorable to him, either because it was exculpatory or had impeaching value; (2) that the state had the materials and failed to disclose them, "either willfully or inadvertently"; and (3) that the evidence was material to the defense, *i.e.*, "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 282 (1999).

*Brady*'s requirement of materiality has particular significance in this case. Supreme Court precedent does not "automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." *United States v. Bagley*, 473 U.S. 667, 677 (1985) (internal quotation marks omitted). Rather, evidence is "material" and prejudice ensues for purposes of the *Brady* inquiry "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. The "touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). "[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678. Finally, the materiality of suppressed evidence is "considered collectively, not item by item." *Kyles*, 514 U.S. at 436. The "court may

consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case" and "should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken" had full disclosure been made. *Bagley*, 473 U.S. at 683.

On appeal from federal habeas review of a state capital murder conviction, we review the district court's denial of relief on the basis of the state court record *de novo*. *See Tucker v. Ozmint*, 350 F.3d 433, 438 (4th Cir. 2003). However, because the state court adjudicated Moseley's *Brady* claim on the merits, we review the matter in light of the limits on federal habeas review of a state conviction that are imposed by § 2254(d). When a habeas petitioner's constitutional claim has been "adjudicated on the merits in State court proceedings," we may not grant relief unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d)(1) & (d)(2).

A state court's decision is contrary to clearly established federal law under § 2254(d) where it "applies a rule that contradicts the governing law set forth" by the United States Supreme Court, *Williams v. Taylor*, 529 U.S. 362, 405 (2000), or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent," *id.* at 406. A state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular

state prisoner's case." *Id.* at 407. The standard is quite deferential. "The state court's application of clearly established federal law must be 'objectively unreasonable,' and 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Robinson v. Polk*, 438 F.3d 350, 355 (4th Cir. 2006) (quoting *Williams*, 529 U.S. at 411). Furthermore, the state court need not cite relevant Supreme Court decisions or even be aware of them. *See id.* at 358. When "assessing the reasonableness of the state court's application of federal law," we "review the *result* that the state court reached, not whether its decision was well reasoned." *Id.* (internal quotation marks and alterations omitted).

## IV.

With these principles in mind, we turn to the specific *Brady* claim presented by Moseley to the state court. After Moseley was granted discovery in the state MAR proceedings, he learned that the Stokes County authorities investigating the Johnson murder failed to provide the Forsyth County prosecutor with several documents from their investigative file. In particular, there were a number of documents generated in the early phases of the Johnson murder investigation which led to the initial identification of Daniel Cannaday and Dexter Mabe (among others) as potential suspects, but which had not been included in the files produced to Forysth County. Moseley argues that, had he been privy to these additional documents at the time, there is a reasonable probability that he could have successfully pursued and presented an argument that either Cannaday or Mabe was Johnson's killer and, thereby, that the result of his trial for the murder of Henley would have been different.[4]

---

[4]Before the state MAR court, Moseley actually pursued claims that the state withheld evidence implicating four men in Johnson's murder: Daniel Cannaday, Dexter Mabe, Ted Beck, and Steve Thomas Michael. He has

A.

1.

We begin with the evidence that Moseley contends implicates Cannaday as Johnson's murderer, which we consider in conjunction with the evidence regarding Cannaday that was produced to Moseley and that he contends could have been developed had full disclosure taken place.

Immediately after Johnson's body was found, the investigating law enforcement officers interviewed Edward Moore, an off-duty Forsyth County police officer who was working at the SRO Club the evening that Johnson disappeared, and Shannon Jarrell Hill, who was a patron of the club that evening. Summaries of the interviews were prepared, but portions of them were not included in the Stokes County materials forwarded to Forsyth County.

According to the summaries, Moore told the officers that he saw Johnson walking outside the SRO Club at approximately 1:00 a.m., with a white male, approximately 5′8″ tall, 192 pounds, with dark brown hair and a medium build, wearing a cowboy hat, blue jeans, a light plaid shirt, and brown loafer shoes with shoe strings. Moore had never seen the man before. Within a few days, Moore was shown a photographic line-up that included photographs of Dexter Mabe (the #2 photograph) and Daniel Cannaday (the #3 photograph), but not Moseley (who had not yet been identified as a suspect). According to the summaries, Moore identified, with "[n]o doubt," the #3 photograph of the lineup as the one depicting the man walking with Johnson. J.A. 338. At the state MAR

---

abandoned the claims pertaining to Beck and Michael. With regard to Cannaday and Mabe, Moseley asserts that he may have been able to convince a jury that one or the other, but not both, was the actual murderer. He has never asserted that the men acted jointly.

hearing, however, Moore was not so definitive in his identification. He testified that he initially "picked two and three" from the photographic lineup, but "stuck with three." J.A. 2166. And Moore was never asked to confirm or deny the officer's "[n]o doubt" notation. Moore further testified that he was about ten feet away from the man and was only able to see his profile, the cowboy hat, and part of his face. He also testified that, when he was shown a picture of Moseley for the first time in 2000, he found the resemblance between Moseley and Cannaday to be "uncanny." J.A. 2169. In Moore's own words, they "looked the same." J.A. 2169.

Hill told the officers that she saw Johnson slow dancing in the SRO Club with a white male, approximately 165 pounds, with sandy brown hair, at approximately 1:00 a.m. on the night Johnson disappeared. However, she described the dress of the man quite differently from Moore—beige or tan dress pants, an off-white button-up shirt, and tan dress shoes. According to the police summary, when Hill was shown the photographic lineup, she told the police that numbers three and four from the lineup "look[ed] familiar" and that number three "look[ed] like the guy" that was dancing with Johnson. J.A. 339. Hill did not testify at the evidentiary hearing and appears to have never been shown a photograph of Moseley.

Also undisclosed to Moseley was a letter written by Johnson to Cannaday the week before her murder, as well as summaries of police interviews of two friends and coworkers of Johnson. In the letter, Johnson wrote that she still wanted to marry Cannaday but knew he intended to marry someone else. She also wrote that she was seeing other men. She mentioned that Cannaday had asked to talk to her during the upcoming weekend, but told him that if she did not hear from him, she would know that he wanted to be with his new girlfriend. Debra Wells, Johnson's coworker, told police that someone named Danny called for Johnson at work the Friday before her murder and that Johnson told her that the man wanted to start dating her again. Shirley Brim Jones, a friend and

coworker of Johnson, told the police that Cannaday was possessive of Johnson when they were dating, but confirmed that Cannaday had ended the relationship because Johnson suffered from emotional problems.

Finally, Cannaday's criminal record was not disclosed to the defense. It contains a charge of attempted rape in 1979 that was dropped and an acquittal for a charge of assault the same year.

According to the state MAR court, the police interview summaries of Cannaday, Margaret Sisk (a waitress in a restaurant that Cannaday and Johnson sometimes visited), and three patrons of the club that night were disclosed to the defense prior to the Henley trial. Sisk told officers that Cannaday seemed jealous of Johnson when they were together and that Johnson would act differently when she was with Cannaday. Sisk was unable to testify at the evidentiary hearing because of health problems. The three patrons of the club identified Cannaday and others in the photographic lineup as persons who had been to the SRO Club in the past, but they were unable to place Cannaday at the club or with Johnson on the night of the murder.

Cannaday, who was also interviewed early in the Johnson murder investigation, confirmed that he had ended his relationship with Johnson months before the murder because of her mood swings. He admitted that he had called Johnson the week before her death to ask her about an anonymous call his father received from a woman claiming to be pregnant with Cannaday's child. Cannaday thought that Johnson might have made the call in an effort to reunite with him. However, Johnson denied making the call and, consistent with her letter, told Cannaday that she was seeing another man. Cannaday denied calling Johnson on the day she was killed and said that he had never been to the SRO Club.[5] He told the police that he was

---

[5]Johnson's letter to Cannaday appears to at least partially confirm Cannaday's statements. For example, Johnson wrote that Cannaday's tele-

with his new girlfriend, Sue Peck, the evening of Johnson's murder. He also volunteered to submit to a polygraph examination and blood test. As noted previously, Cannaday was eliminated as a suspect after his DNA failed to match the DNA found on Johnson's body.

Neither the state nor the defense interviewed Sue Peck during the investigation of Johnson's murder. When located for the state evidentiary hearing nearly ten years later, Peck confirmed that she was in a relationship with Cannaday at the time and that they were together on the evening of Johnson's murder. However, she testified that she left Cannaday at his father's house around 9:00 p.m. or 10:00 p.m. on the evening of Johnson's murder, approximately an hour and fifteen minutes away from Winston-Salem. According to Peck, Cannaday did not have a car but would have had access to his father's car. Cannaday was present and available to testify at the state MAR hearing, but Moseley did not call him as a witness to confirm or deny the statements he had made to the police.

2.

Moseley also contends that he was prejudiced by the state's failure to disclose evidence allegedly implicating Dexter Mabe as Johnson's murderer. Specifically, Moseley points to the letter Johnson wrote to Cannaday as well as a missing portion of the Jones interview, both of which recount that Mabe had threatened Johnson in the past for interfering in Mabe's relationship with Hoss. In addition, Mark Lamb, a patron at the SRO Club on the night of Johnson's murder, told investi-

---

phone call to her "over someone calling" had interfered with her attempts to heal from their breakup, and that she knew he was seeing someone else. J.A. 362. She also mentioned to Cannaday that she had been going to a new club in Winston-Salem where no one knew her and that she was seeing other people.

gators that he saw Johnson arguing with Mabe. When Lamb asked Johnson about the argument, Johnson said that Mabe thought she was interfering in his relationship with his girl-friend. At the evidentiary hearing, Lamb testified that Johnson initially "seemed a bit upset over it but it kind of blew away after a couple of minutes" and "didn't seem to result in very much." J.A. 2196. Moseley also points to police records indicating a number of charges and convictions against Mabe for angry or assaultive behavior and a criminal investigation report regarding a previous altercation between Mabe, Hoss, and Johnson, including allegations that Mabe had assaulted the women.

When Mabe was interviewed by law enforcement officers, he confirmed that he was at the SRO Club that evening with Hoss and Johnson and that he and Johnson argued at one point about his relationship with Hoss. However, he told the officers that he and Hoss left the club before Johnson and spent the rest of the evening together in a nearby hotel. Mabe also agreed to a polygraph examination and gave blood and hair samples for comparison purposes. Like Cannaday, he was eliminated as a suspect after his DNA did not match the semen found in Johnson's body.

At the state MAR hearing, Hoss confirmed the acrimonious relationship between Mabe and Johnson, as well as the argument that evening. However, she testified that she and Mabe (whom she was no longer seeing at the time of the hearing) left the club somewhere between 11:30 p.m. and 12:00 a.m. and were together for the rest of the night, thus confirming Mabe's alibi.[6]

---

[6]According to an additional police interview summary, Rose Inmann, who was also a patron of the club that night, told officers that she saw Mabe and Johnson dancing together an hour *after* Mabe and Hoss left the club. However, this was wholly inconsistent both with the testimony of Hoss and Mabe as well as the evidence that Mabe and Johnson *disliked* one another and argued that evening. In any event, Inmann was unable to substantiate the unsworn statement or recall any of the events of the evening when called to testify at the state MAR hearing.

## B.

Moseley claims that, when considered in conjunction with the evidence that was disclosed to him at the time of his trial, he has proven that the state's nondisclosure prejudiced him in his defense to the Henley murder. More specifically, he argues that he has demonstrated a reasonable probability that he could have pursued and presented a successful argument that either Cannaday or Mabe was Johnson's killer and, thereby, created enough doubt to obtain an acquittal or to mitigate against the death sentence. Like the district court, however, we cannot say that the state MAR court's decision rejecting Moseley's claim was contrary to, or an unreasonable application of, the due process principles of *Brady* and its progeny.

First, the evidence implicating Moseley as Henley's murderer was independently strong. Henley's body was found in a rural area, five miles and nine minutes from the SRO Club, within one mile of Henley's home, and in a place known to have been traveled by Moseley in the past. There was eyewitness testimony from Key and Casstevens, Moseley's friends who accompanied him to the SRO Club that evening, that Moseley borrowed Key's car at approximately 1:30 a.m. to drive Henley home from the club and that Henley and Moseley left in the vehicle shortly thereafter. Thus, Moseley was the last person seen with Henley, who never arrived home. Moseley took more than twice as long as expected to return to the club with Key's vehicle, where Key and Casstevens were waiting for him. When Moseley finally did meet up with Key and Casstevens, who had left the club in Casstevens' vehicle after tiring of the wait, Moseley falsely told them that "the bitch" lived farther away than she had said (presumably to justify the delay in returning) and had no money (which was apparently true). Then, after the rumor broke that a woman had disappeared from the SRO Club that night, Moseley telephoned Key and Casstevens and asked them to lie and say that Moseley had not been at the club. While Moseley

claimed that this was because he was on probation, both Key and Casstevens had frequented clubs with Moseley before and Moseley had never previously made such a request.

The physical evidence also pointed to Moseley's guilt. Although Key and Moseley had washed Key's car just prior to going to the SRO Club the evening of the murder, Key found dirt and weeds in the driver's side floorboard of the car when Moseley returned the car to him. Moseley's boots, which Casstevens testified were clean at the SRO Club, had dirt on them when the police seized them from Moseley's residence, and the state's soil expert testified that the soil on the boots was consistent with the soil in the field where Henley's body was found. Also, Moseley's boots, pants, and shirt had traces of blood on them indicating a spatter or secondary transfer that the prosecution persuasively argued could have been picked up when Moseley, unclothed during the assault and murder, put his clothing back on after cleaning himself with the victim's still-missing clothing.

Second, the evidence implicating Moseley as Johnson's rapist and murderer was independently strong. Eyewitness testimony placed Moseley and Johnson at the SRO Club on the night of the murder dancing and talking together at various times. Johnson never returned home that night and was found raped and murdered, also in a rural area known to Moseley. And, of course, evidence of the semen found in Johnson's body matched the DNA samples obtained from Moseley.

Finally, as noted by the state MAR court, the evidence that the same person raped and murdered both Henley and Johnson, and that that person was Moseley, was compelling. Dr. Patrick Lantz, the pathologist who performed the autopsy on Johnson's body, compared the injuries suffered by Johnson and by Henley. In addition to noting their similar physical features, age, and disabilities, Dr. Lantz testified as to the

striking similarities in the injuries inflicted upon both women. Specifically,

> The faces of both women showed multiple blunt force injuries. Both suffered numerous bruises around the forehead with bleeding in the soft tissue around the eyes. There were contusions to the sides of their heads, cheeks and particularly their ears. Both women had bruising or hemorrhaging in their neck areas, demonstrating the similarity of strangulation. They both had abrasions and bruising to their jaws and chins. They had both suffered curvilinear pattern injuries to the back left side of their heads. Both women had defensive bruising to their upper right arms and inner right elbows. [Henley] had suffered two incised wounds beginning near her pubic area and traveling in an upward left direction. [Johnson] had similar sharp injuries although hers were on the back of her body. Both women had contusions over the right shoulder region and both had fractured ribs. Both women had suffered injury to their genitalia indicating that a foreign object had been inserted. Both women had lingual contusions where their tongues had been between their teeth as they received blows to their faces.

J.A. 2475-76. As noted by the state MAR court, FBI Special Agent Gregory Cooper also testified as to these similarities, as well as to the consistent victimology of the murders:

> [B]oth victims were very small in stature; both had birth defects affecting their speech and had received medical treatment therefor; both were living at home in somewhat dependent relationships with their parents; both were romantically unattached; both attended the SRO club alone; and both were considered friendly and unsuspecting. [Special Agent] Cooper concluded that the offender in the two cases

was looking for somebody whom he could easily dominate, control, and manipulate.

J.A. 2476-77. Of additional significance was the fact that the three-month period between the two murders was a typical "cooling off period" for serial killers, that the "initial contact and abduction site was the same," J.A. 2477, and that the crime scenes were similar. Specifically,

> both were rural with no lighting; both were convenient to the SRO club; both were secluded, private and somewhat isolated. The fact that both bodies were nude was significant because from the offender's perspective this delays identification of the victim. Taking clothes and jewelry is typical because these items are trophies for the offender so that he may relive the crime and relish the experience.

J.A. 2477. Finally, Special Agent Cooper, having confirmed the similarities in the injuries and attacks attested to by Dr. Lantz, "also noted the signature aspects of the offender's method of operation: overkill. Based on his investigative analysis of both the Stokes County and the Forsyth County murders, [Special Agent] Cooper's opinion was that the two murders were committed by the same person." J.A. 2477.

In sum, the similarities of the two crimes were striking, the "signature" of the crimes the same, and eyewitness testimony placed Moseley with *both* victims at the SRO Club immediately prior to the victims being last seen alive there. Yet in contrast to this compelling evidence that Moseley was the murderer of both women, there is no evidence connecting Cannaday to Henley in any way, much less to her murder, and the undisclosed evidence that Moseley asserts implicates Cannaday or Mabe as Johnson's murderer is too weak and speculative to have created a reasonable probability that the result of his trial for Henley's murder would have been different.

With regard to Cannaday, the evidence at best demonstrated that Cannaday was jealous or possessive of Johnson when they were dating and may have discussed seeing Johnson during the weekend of her murder. However, Cannaday ended the relationship with Johnson months before her murder and was in a relationship with another woman at the time, facts that Johnson's letter to Cannaday confirms. There was no evidence that Cannaday had ever threatened Johnson or was violent towards her during their relationship. And while the photographic lineup identifications made by Moore and Hill seem initially troubling, the evidence developed at the state MAR hearing fell well short of that necessary to demonstrate the requisite prejudice. Although both witnesses apparently settled upon Cannaday's photograph from the lineup as the man they saw Johnson with that evening, neither was immediately confident in their choice, Moseley was not included in the photographic lineup, and there is a strong physical resemblance between the two men. Hill could not be located prior to the evidentiary hearing, has never been shown a photograph of Moseley for identification, and described the dress of the man she saw dancing with Johnson much differently from the dress of the man Moore saw Johnson leaving the club with that night. Moore, when shown a picture of Moseley prior to the state MAR hearing, acknowledged that it bore an uncanny resemblance to Cannaday's picture in the 1991 lineup, *i.e.*, that they "looked the same," and reiterated that the man was wearing a cowboy hat and that he was only able to see part of the man's face.

The state MAR court, after reviewing the undisclosed documents and observing Moore's testimony at the evidentiary hearing, found Moore's 1991 identification of Cannaday's photograph as the man who left with Johnson to be sincere, but nonetheless "extremely weak." J.A. 2474. As further noted by the court, Cannaday had an alibi from his girlfriend until around 10:00 p.m. that night, when she dropped him off at his father's home more than an hour away from the SRO Club. The patrons who identified Cannaday as a prior patron

at the club did not know him personally and did not place him there on the night of the murder. And, Sherry Hoss, who was with Johnson at the Club that night and did know Cannaday personally, did not see him at the club that evening. In contrast, patrons at the club that evening who knew Moseley testified that Moseley was at the club, wearing a cowboy hat, dancing and conversing with Johnson. And, of course, Cannaday, unlike Moseley, was definitively excluded by DNA testing as the source of the semen found in Johnson's body, and Cannaday was eliminated early on as a suspect in her murder. Indeed, as pointed out by the district court, Moore's testimony at the state MAR hearing not only severely undercut his identification of Cannaday from the photographic lineup, but, when considered in conjunction with the testimony of other witnesses, arguably amounts to inculpatory evidence that Moseley was the man seen outside the club with Johnson that evening.

With regard to Mabe, the evidence allegedly implicating him as Johnson's murderer is even weaker. At best, it demonstrates that Mabe and Johnson did not get along, that Mabe had threatened Johnson in the past for interfering in his relationship with Hoss, and that the two had argued earlier in the evening at the SRO Club. However, Johnson met Hoss and Mabe at the SRO club that night as prearranged, an eyewitness confirmed that the argument between Johnson and Mabe blew over, and there is no reliable evidence to contradict the consistent testimony of Hoss and Mabe that they left the club at 11:30 p.m. that night, returned to the nearby motel room that they had rented before going to the club, and remained for the rest of the night.

For these reasons, we, like the state court and the district court, are satisfied that there is no reasonable probability that the result of Moseley's trial for Henley's murder would have been different had the additional Stokes County materials been produced to him by the Forsyth County prosecutor.

Accordingly, Moseley is not entitled to habeas relief on this basis.[7]

## C.

Finally, we note briefly Moseley's additional claim that he was prejudiced because the undisclosed evidence, when considered in conjunction with the evidence that was disclosed and developed during the state MAR evidentiary hearing, was sufficiently compelling to raise a reasonable probability that the trial court would have excluded *all* of the Johnson murder evidence from presentation in the Henley trial. We need not tarry long with this contention. After conducting the evidentiary hearing and reviewing the undisclosed evidence pertaining to Cannaday and Mabe, the state MAR court ruled that the evidence would *not* have changed the trial ruling that evidence of the Johnson murder could be properly presented under Rule 404(b). Given that the judge in the state MAR proceedings was also the trial judge, there is no reasonable prob-

---

[7]In the opening brief, Moseley's counsel asserted that the district court erred in its analysis of the underlying *Brady* claim and, therefore, in its similar determination that the state court's consistent ruling was not unreasonable. In the reply brief and, more particularly at oral argument, Moseley's counsel focused upon a complaint that the state court, unlike the district court, failed to consider *all* of the evidence that was undisclosed, regardless of whether it would be admissible at trial, along with any evidence that could have reasonably been uncovered in a subsequent defense investigation. As a general rule, arguments not specifically raised and addressed in opening brief, but raised for the first time in reply, are deemed forfeited. *See Cavallo v. Star Enter.*, 100 F.3d 1150, 1152 n.2 (4th Cir. 1996). In this case, however, the failure to squarely brief the issue has no effect upon our decision. As noted previously, we "review the *result* that the state court reached, not whether its decision was well reasoned." *Robinson v. Polk*, 438 F.3d 350, 358 (4th Cir. 2006) (internal quotation marks and alterations omitted). Furthermore, in assessing the reasonableness of the state MAR court's application of federal law, we (like the district court) have independently considered *all* of the evidence relied upon by Moseley in light of his *Brady* claim, including that which he contends would have been developed by competent trial counsel, and agree that he failed to demonstrate the requisite materiality.

ability that the suppressed evidence would have resulted in the trial court's issuance of a different Rule 404(b) ruling.[8]

## V.

To conclude, the state MAR court's determination that production of the undisclosed evidence would not have resulted in a different verdict, either at guilt or sentencing, in Moseley's trial for the murder of Henley was not an unreasonable one. The evidence that Moseley murdered Johnson is strong. The evidence that Moseley murdered Henley is strong. And, given the similarities in the murders, the evidence that the same person murdered both women and that the person was Moseley is overwhelming. In contrast, the evidence allegedly implicating Cannaday or Mabe in Johnson's murder is speculative, and there is *no* evidence that implicates Cannaday or Mabe in the murder of Henley. Because we agree that the nondisclosure by the state was not "so serious that there is a reasonable probability that the suppressed evidence would

---

[8]The state MAR court added that it would have deemed the suppressed evidence inadmissible under state law because it raised nothing more than conjecture or speculation as to Cannaday's and Mabe's involvement in Johnson's murder. *See State v. Cotton*, 351 S.E.2d 277, 279-80 (N.C. 1987) (holding that under Rule 401 of the North Carolina Rules of Evidence, "[e]vidence that another committed the crime for which the defendant is charged generally is relevant and admissible as long as it does more than create an inference or conjecture in this regard. It must point directly to the guilt of the other party. Under Rule 401 such evidence must tend *both* to implicate another *and* be inconsistent with the guilt of the defendant.") (internal citations omitted). We express no opinion as to the propriety of this hypothetical state evidentiary ruling or whether the evidence would have been admissible under state or federal law, neither of which is the issue before us. Under *Brady*, the question is whether Moseley was prejudiced by the nondisclosure of the evidence because there is a reasonable probability that the outcome of the proceeding would have been different had he been privy to it. Thus, while we agree that the evidence allegedly implicating Mabe and Cannaday is indeed speculative, our ruling is limited to the question of whether Moseley demonstrated that he was prejudiced by the failure of the state to disclose the documents at issue.

have produced a different verdict," *Strickler*, 527 U.S. at 281, the state court's rejection of Moseley's *Brady* claim is neither contrary to, nor an unreasonable application of, the applicable precedents and Moseley is not entitled to federal habeas relief. Accordingly, we affirm the district court's order denying Moseley's petition for federal habeas corpus relief.

*AFFIRMED*