**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 10-1435**

———————————

HILL HOLLIDAY CONNORS COSMOPULOS, INCORPORATED,
d/b/a/ Erwin-Penland,

              Plaintiff - Appellee,

     v.

JEFFREY GREENFIELD; 1ST APPROACH LLC,

              Defendants and Third-Party Plaintiffs -
              Appellants,

     v.

CELLCO PARTNERSHIP, d/b/a/ Verizon Wireless;
JOSEPH A. ERWIN,

              Third-Party Defendants - Appellees.

———————————

Appeal from the United States District Court for the District of
South Carolina, at Greenville.  G. Ross Anderson, Jr., Senior
District Judge.  (6:08-cv-03980-GRA)

———————————

Argued:  March 23, 2011          Decided:  June 2, 2011

———————————

Before GREGORY, AGEE, and KEENAN, Circuit Judges.

———————————

Affirmed by unpublished opinion.  Judge Agee wrote the majority
opinion, in which Judge Keenan joined.  Judge Gregory wrote a
dissenting opinion.

———————————

**ARGUED:** Jay Stanley Horowitz, HOROWITZ & FORBES, LLP, Denver, Colorado, for Appellants. Brenda R. Sharton, GOODWIN|PROCTER, Boston, Massachusetts, for Appellees. **ON BRIEF:** Phillip Jeffrey North, THE LAW OFFICE OF P. JEFFREY NORTH LLC, Hilton Head Island, South Carolina, for Appellants. Stacey B. Ardini, Kunal Pasricha, GOODWIN|PROCTER, Boston, Massachusetts, William F. Sheehan, GOODWIN|PROCTER, Washington, D.C., Bernie W. Ellis, Rita M. McKinney, MCNAIR LAW FIRM, P.A., Greenville, South Carolina, for Appellee Hill Holliday Connors Cosmopulos, Incorporated, d/b/a/ Erwin Penland, and Joseph A. Erwin; Robert A. Muckenfuss, David M. Chromy, Elizabeth M. Z. Timmermans, MCGUIREWOODS LLP, Charlotte, North Carolina, for Appellee Cellco Partnership, d/b/a Verizon Wireless.

---

Unpublished opinions are not binding precedent in this circuit.

AGEE, Circuit Judge:

Jeffrey Greenfield collaborated with Erwin-Penland, a South Carolina advertising agency, on a marketing plan aimed at securing a contract with the Captain D's restaurant chain. Captain D's declined to implement the proposal, which centered on the general concept of a gospel choir competition entitled "How Sweet the Sound." Erwin-Penland, however, later convinced another client, Verizon Wireless, to fund a modified version of the project, but without the participation of Greenfield or his company, 1st Approach LLC (collectively "Greenfield"). Greenfield subsequently demanded compensation from Erwin-Penland, who responded by filing a declaratory judgment action in South Carolina state court, seeking a ruling that Greenfield had no ownership interest in the "How Sweet the Sound" concept.

Greenfield removed the case to the United States District Court for the District of South Carolina and instituted various counterclaims, including a third-party complaint against Verizon Wireless and Joseph Erwin — the president of Erwin-Penland. The district court concluded that Greenfield had no protected interest in the "How Sweet the Sound" project and granted summary judgment in favor of Erwin-Penland and the

3

third-party defendants.[1]  Greenfield now challenges that ruling on appeal.  For the reasons stated herein, we affirm the judgment of the district court.

I.

Joseph Erwin heard Greenfield speak on the subject of "branded entertainment" at a conference.  Subsequently, he asked Greenfield to collaborate with Erwin-Penland on a marketing proposal aimed at securing an account with the Captain D's restaurant chain.  Greenfield accepted Erwin's offer without entering into a written agreement establishing the terms of his relationship with Erwin-Penland.

After a series of collaborative phone calls and emails, Greenfield sent Erwin-Penland a marketing deck outlining a concept he labeled "'Amazing Grace' Captain D's Branded Reality Show."  Joint Appendix ("J.A.") at 1375.  Erwin-Penland subsequently changed the name of the proposal to "How Sweet the Sound."  Id. at 712, 896.  The "How Sweet the Sound" concept involved "[t]he top 20 church choirs in the US competing for over $250,000 in prizes and the title of the Best Choir in the USA."  Id. at 1376.  A production team of producers and

---

[1]   We refer to Verizon Wireless and Joseph Erwin collectively as the "third-party defendants."

4

cameramen, along with a host "[s]imilar to Ryan Seacrest on American Idol," would "cross the country in [a] 6 week trek of visiting EVERY Captain D's location," using local media to publicize the event. Id. at 1377. Once there, the team would interview local choir members about their "choir and why they think they are the best in the US." Id.

Competitions would then take place in Atlanta, Georgia; Jackson, Mississippi; Birmingham, Alabama; and Charleston, South Carolina between the best twenty-five choirs in each region. Each contest would be featured in a television episode, take place "in large arenas," and "have a large panel of celebrity judges who [would] vote on the best overall performance." Id. The winners of the regional competitions would then "be invited to attend [a] National competition in Nashville," Tennessee featuring "the 4 best church choirs in the country in an authentic inspirational contest to find the #1 Choir in the USA." Id. Winning the national competition would entitle a choir to "the title of the Best Choir in the USA" and "over $250,000 in prizes." Id. at 1376.

In conjunction with the "entertainment" provided by the gospel choir competition, Greenfield proposed marketing Captain D's through three different mediums: product placement, radio, and the internet. The parties intended that Greenfield would serve as producer and talent broker for Captain D's "How

5

Sweet the Sound" project. Although Captain D's expressed some interest in the proposal, it ultimately declined to adopt the plan.

Subsequently, Greenfield and Erwin-Penland presented a similar "How Sweet the Sound" concept to Verizon Wireless, one of Erwin-Penland's existing clients. Modifications were made to this proposal to better suit Verizon Wireless' business model. For example, Greenfield and Erwin-Penland suggested signing choirs up for the competition at Verizon Wireless stores and creating "a CD of the winning choirs" that would be distributed "through stores and agents." Id. at 1587.

Although Verizon Wireless also expressed interest in the "How Sweet the Sound" concept, it had concerns about the plan's projected cost. Greenfield and Erwin-Penland subsequently worked to scale back the television component of the project to a one-hour special or documentary. When Verizon Wireless' response to this less-expensive model was not immediately forthcoming, Greenfield inquired as to whether Verizon Wireless was still interested in the concept or whether he was free to present it to other clients. Erwin-Penland responded that Verizon was still considering the scaled-back plan.

Over a year later, Erwin-Penland and Verizon Wireless implemented a limited "How Sweet the Sound" marketing concept by

6

organizing a single gospel choir competition in Memphis, Tennessee. The project later evolved into a series of gospel choir competitions orchestrated throughout the nation. In 2009, the final contest was televised on the Gospel Music Channel and a documentary about the series appeared on the Black Entertainment Television Network ("BET"). Although other agencies aided Erwin-Penland and Verizon Wireless in implementing the "How Sweet the Sound" concept, Greenfield was not asked to assist, and had no part, in executing the plan.

## II.

Greenfield demanded compensation from Erwin-Penland for its use of the "How Sweet the Sound" marketing plan, which he claimed to have originated. In response, Erwin-Penland filed a declaratory judgment suit in South Carolina state court, requesting a ruling that Greenfield had "no co-ownership interest or rights in the marketing project 'How Sweet the Sound.'" J.A. at 28. Greenfield removed the case to the United States District Court for the District of South Carolina based on the parties' diverse citizenship. See 28 U.S.C. § 1332(a). He then filed a first amended counterclaim and third-party complaint against Erwin-Penland and the third-party defendants, which stated numerous claims for, inter alia, fraud, breach of

7

contract, misappropriation of trade secrets, and unjust enrichment.

Erwin-Penland and the third-party defendants subsequently filed motions for summary judgment as to all of Greenfield's claims. In turn, Greenfield filed a motion for summary judgment on his unjust enrichment and breach of fiduciary duty claims. The district court concluded that no genuine issue of material fact precluded granting judgment as a matter of law to Erwin-Penland and the third-party defendants. Accordingly, the court granted summary judgment in their favor on all claims and denied Greenfield's competing motion for summary judgment.

First, the district court concluded that "Greenfield's purported trade secrets fail[ed] to meet [the] criterion" for protection under the South Carolina Trade Secrets Act ("the Act"), see S.C. Code Ann. § 39-8-20(5), because his "claimed trade secrets [were] not novel or protectable, and, if they were, Greenfield failed to take reasonable steps to protect them."[2] J.A. at 183. Thus, "even assuming the existence of . . . trade secret[s]," id. at 183 n.3, summary judgment was

---

[2] Our summary of the district court's summary judgment orders focuses solely on the portions relevant to the four issues Greenfield raises on appeal.

8

appropriate "for the independent reason that Greenfield failed to take reasonable efforts to protect" them. Id. at 187.

Second, the district court rejected Greenfield's argument that he had "an oral or implied-in-fact contract" with Erwin-Penland that was subject to breach. Id. at 189. Because "[t]he parties did not discuss, let alone come to an agreement on, the essential terms of a contract," the district court concluded "no reasonable trier of fact could find mutual assent as to any essential terms" of an agreement, given "either orally, in writing, or implied" in fact. Id. at 189.

Indeed, the district court concluded that "[a] careful review of the documentary record and deposition testimony" established, "at best, that Erwin-Penland and Greenfield . . . discuss[ed] potential or speculative options for the ["How Sweet the Sound"] concept[]." Id. It was "undisputed that no proposed options made by Greenfield were ever accepted by Erwin-Penland." Id. at 189-90. The district court consequently determined that Greenfield was unable to "point to any objective manifestations and expressions by Erwin-Penland that would be sufficient to establish the existence of a contract." Id. at 190; see also id. ("Mere expectations and one-sided hopes of a party do not make a contract . . . .").

Third, the district court held that Greenfield "failed to satisfy the elements necessary to support" an unjust

9

enrichment claim.  Id. at 199.  Greenfield's "only contribution to" the "How Sweet the Sound" project "was in conjunction with . . . speculative pitches . . . to Verizon Wireless and Captain D's."  Id. at 200.  As he had no "role in executing and implementing the . . . project . . . eventually undertaken by Verizon Wireless" and "did not contribute any trade secret or other protectable information" to the marketing scheme, the district court held that Greenfield was unable to "prove as a matter of law that a non-gratuitous 'benefit' was conferred for which compensation [was] required."  Id.

Fourth, the district court ruled that Greenfield's attempt to cancel Erwin-Penland's "How Sweet the Sound" trademark based on fraudulent representations to the United States Patent and Trademark Office failed as a matter of law. The court stated that even if Greenfield's factual allegations were true, "[t]rademark rights are not based on creativity, but on use in commerce."  Id. at 201.  Because it was "undisputed that Greenfield ha[d] not used the ["How Sweet the Sound"] mark in commerce," he could not "claim trademark rights in the term" or demonstrate "that Erwin-Penland committed fraud in procuring th[e] trademark registration."  Id.

Greenfield noted a timely appeal of the district court's order granting summary judgment.  We have jurisdiction under 28 U.S.C. § 1291.

10

III.

On appeal, Greenfield generally argues the district court misapplied the summary judgment standard in failing to view the record evidence and all inferences drawn therefrom in the light most favorable to him, as the non-moving party. He more specifically avers the district court erred in concluding the "How Sweet the Sound" concept failed to meet the criteria for protection under the Act. For example, Greenfield contends the district court applied "a non-existent novelty requirement" for trade secret protection and ignored a genuine issue of material fact as to whether he took reasonable efforts to preserve the secrecy of the "How Sweet the Sound" marketing scheme. Opening Br. at 23.

Greenfield also challenges the district court's "failure to discern in the" relationship between himself and Erwin-Penland "the basis for imposing contractual and equitable duties" predicated on Erwin-Penland's and Verizon Wireless' "unjust enrichment at [his] expense." Id. at 24. Finally, Greenfield claims the district court erred in refusing to cancel Erwin-Penland's "How Sweet the Sound" trademark based on various

fraudulent assertions made throughout the trademark registration process.[3]  See id.; see also 15 U.S.C. § 1064(3).

In response, Erwin Penland and the third-party defendants argue the Act offers no protection as to any of Greenfield's claims concerning the "How Sweet the Sound" marketing scheme.  They contend the concept was "'readily ascertainable by proper means by the public,'" Response Br. at 19, and that Greenfield "knowingly shared [the plan] with multiple third parties (some of whom were Greenfield's competitors)" without the protection offered by a confidentiality agreement.  Id. at 20.  Accordingly, Erwin Penland and the third-party defendants maintain that "Greenfield cannot prove . . . he took reasonable efforts to maintain the confidentiality of his supposed secrets."  Id.

Based on Greenfield's admissions that the parties "engaged only in preliminary proposals in advance of a speculative pitch for new business and never even discussed the essential terms of a . . . contract," Erwin-Penland and Verizon Wireless also dispute Greenfield's claim that a binding contractual relationship was established.  Id. at 20-21.  They

---

[3]  Greenfield raised various fiduciary-duty claims in his Opening Brief but informed the Court at oral argument he no longer asserted those issues on appeal.  As Greenfield has now conceded there was no error as to those claims, we do not address them here.

further argue that Greenfield is unable to make out a claim for unjust enrichment, as he contributed neither labor nor a protected piece of intellectual property to the marketing scheme Verizon Wireless eventually implemented. Lastly, Erwin-Penland and the third-party defendants would have us reject Greenfield's trademark-cancellation claim because "he makes no claim to ever having used the ["How Sweet the Sound"] mark in commerce." Id. at 34.

IV.

"We review de novo a district court's award of summary judgment, viewing the facts and inferences reasonably drawn therefrom in the light most favorable to the nonmoving party." Fraternal Order of Police Lodge No. 89 v. Prince George's County, 608 F.3d 183, 188 (4th Cir. 2010). Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In this case, the record demonstrates that no genuine dispute as to a material fact precluded granting judgment as a matter of law in favor of Erwin-Penland and the third-party defendants. See Estate of Kimmell v. Seven Up Bottling Co. of Elkton, Inc., 993 F.2d 410, 412 (4th Cir. 1993) ("[I]n a case where 'the record taken as a whole could not lead a rational

13

trier of fact to find for the non-moving party, there is no genuine issue for trial' and summary judgment is proper." (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986))).

## A. Trade Secret

The South Carolina Trade Secrets Act protects "trade secrets" that meet two separate criteria.[4] First, the trade secret must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainably by proper means by the public or any other person who can obtain economic value from its disclosure or use." S.C. Code Ann. § 39-8-20(5)(a)(i). Second, the trade secret must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Id. § 39-8-

---

[4] The Act defines a "'[t]rade secret'" asinformation including but not limited to, a formula, pattern, compilation, program, device, method, technique, product, system, or process, design, prototype, procedure, or code that:

(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other person who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

S.C. Code Ann. 39-8-20(5)(a) (emphasis added).

14

20(5)(a)(ii).  As the plain language of the statute provides, information must satisfy both criteria in order to be deemed a "trade secret" under the Act.[5]  Id. § 39-8-20(5)(a).

For purposes of this opinion, we assume, without deciding, that the "How Sweet the Sound" concept satisfies the Act's first criterion.[6]  A reasonable finder of fact, however, could not conclude that Greenfield took reasonable efforts to maintain the secrecy of the "How Sweet the Sound" marketing scheme, the second criterion for protection under the Act.  In Lowndes Products, Inc. v. Brower, 191 S.E.2d 761 (S.C. 1972), the Supreme Court of South Carolina construed the reasonable-efforts-to-maintain-secrecy requirement as setting a high bar

---

[5]  See also Restatement (Third) of Unfair Competition § 39 (1995)  (defining a "trade secret" as "any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others"); Restatement (First) of Torts § 757 cmt. b (1939) ("The subject matter of a trade secret must be secret.  Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret.").

[6]  See S.C. Code Ann. § 39-8-20(5)(b) ("A trade secret may consist of a simple fact, item, or procedure, or a series or sequence of items or procedures which, although individually could be perceived as relatively minor or simple, collectively can make a substantial difference in the efficiency of a process or the production of a product, or may be the basis of a marketing or commercial strategy.  The collective effect of the items and procedures must be considered in any analysis of whether a trade secret exists and not the general knowledge of each individual item or procedure.").

15

for trade secret protection.[7]  See id. at 766; see also Woven Elecs. Corp. v. Advance Grp., Inc., 930 F.2d 913, Nos. 89-1580 & 89-1588, 1991 WL 54118, at *3 (4th Cir. Apr. 15, 1991), as amended May 6, 1991 (unpublished) (characterizing "a consistent effort . . . to keep" a "wire weaving process" secret, rather than "isolated attempts to protect [that information's] confidentiality," as sufficient to meet the reasonable-efforts-to-maintain-secrecy requirement) (citing Lowndes Prods., 191 S.E.2d at 765)).

Individuals "entitled to a trade secret" and desiring "to have its exclusive use in [their] own business" are barred from "lightly or voluntarily hazard[ing] its leakage or escape." Lowndes Prods., 191 S.E.2d at 766 (quotation omitted). Revealing a trade secret to others is consequently fatal to its protected status unless one "exercise[s] eternal vigilance."[8] Id. (quotation omitted).  The exercise of "eternal vigilance" imposes a heavy burden on the owner of a trade secret, as it "calls for constant warnings to all persons to whom the trade

---

[7]  See also 20 S.C. Jur. Intellectual Prop. § 75 (2011) (engaging in an extensive discussion of the reasonable-efforts-to-maintain-secrecy requirement based on Lowndes Products).

[8]  Although the dissent is correct that "[d]isclosure . . . does not necessarily vitiate secrecy," Dis. Op. at 28, it fails to account for South Carolina case law conditioning further trade secret protection on the exercise of "eternal vigilance." Lowndes Prods., 191 S.E.2d at 766.

secret has become known and obtaining from each an agreement, preferably in writing, acknowledging its secrecy and promising to respect it."[9]  Id. (quotation omitted).

The undisputed evidence in this case demonstrates that Greenfield did not exercise "eternal vigilance" in sharing the details of the "How Sweet the Sound" marketing scheme with others.  To the contrary, Greenfield transmitted the "How Sweet the Sound" concept to Erwin-Penland, J.A. at 775, and presented the plan to Verizon Wireless in the presence of multiple third parties — including members of "other ad agenc[ies]" — without the benefit of any type of nondisclosure agreement.  Id. at 791. The record, without contradiction, also supports the district court's finding that "[t]he alleged 'trade secrets' in question had . . . been previously shared with a different third-party, the restaurant chain Captain D's, with whom Greenfield . . . had no confidentiality or other agreement."  Id. at 186.

It would thus be unreasonable, if not impossible, for a finder of fact to conclude that Greenfield took "efforts that [were] reasonable under the circumstances to maintain [the]

---

[9]  See also 20 S.C. Jur. Intellectual Prop. § 75 (2011) ("'[E]ternal vigilance' in the form of 'constant warnings to all persons to whom the trade secret has become known and obtaining from each an agreement, preferably in writing, acknowledging its secrecy and promising to respect it' is required." (quoting Loundes Prods., 191 S.E.2d at 761)).

17

secrecy" of his marketing strategy.  S.C. Code Ann. § 39-8-20(5)(a)(ii).  And such efforts are mandatory under the plain language of the Act if a trade secret is to merit its protection.  See id.; Lowndes Prods., 191 S.E.2d at 765 ("[A]ll trade secrets are not entitled to . . . protection . . . .); 20 S.C. Jur. Intellectual Prop. § 76 (2011) ("A third party who receives information without any express or implied assurance of confidence may do what it likes with the information.").

Although Greenfield unilaterally placed confidentiality notices on some of his materials, these notations are not sufficient to create a genuine issue of material fact as to the reasonableness of his conduct.[10]  South Carolina courts do, of course, require such "warnings to all persons to whom the trade secret has become known." Lowndes Prods., 191 S.E.2d at 766 (quotation omitted).  But South Carolina law is clear that warnings alone are insufficient to place a trade secret within the sphere of protection provided by the Act.  See id. (characterizing "isolated steps . . . taken to

---

[10]  In his Opening Brief, Greenfield also notes that he registered the "How Sweet the Sound" concept as a "Gospel Music Contest" with the Writers' Guild of America, listing himself and Joseph Erwin as co-owners.  See Opening Br. at 18.  Greenfield does not contend, however, that this registration constituted reasonable measures to maintain the secrecy of the "How Sweet the Sound" marketing plan.

18

implement secrecy" as insufficient to merit trade secret protection).

A trade secret owner who knowingly discloses proprietary information to others must also "obtain[] from each an agreement . . . acknowledging its secrecy and promising to respect it."[11] Id. (quotation omitted). Greenfield points to nothing in the record suggesting he obtained a confidentiality agreement from the multiple entities to whom he presented the "How Sweet the Sound" concept.[12] Accordingly, the district court correctly determined no material facts were in dispute and correctly held that (1) Greenfield failed to take reasonable efforts to maintain the secrecy of his marketing plan, see 20

---

[11] We respect the dissent's viewpoint but are compelled to adhere to the principle that "federal courts sitting in diversity must apply state substantive law, decisional as well as statutory, in the adjudication of state-created rights." Hottle v. Beech Aircraft Corp., 47 F.3d 106, 109 (4th Cir. 1995). Accordingly, we emphasize Greenfield's failure to procure a non-disclosure agreement of any kind from any of the parties to whom he disclosed his trade secrets because that consideration is controlling under the precedent of South Carolina's highest court. See Liberty Mut. Ins. Co. v. Triangle Indus., Inc., 957 F.2d 1153, 1156 (4th Cir. 1992) ("[A] federal court sitting in diversity has a duty to apply the operative state law as would the highest court of the state in which the suit was brought.").

[12] See Estate of Kimmell, 993 F.2d at 412 (acknowledging that "the non-moving party may not rest on its pleadings, but must come forward with specific facts showing that evidence exists to support its claims and that there is a genuine issue for trial" (citing Celotex Corp v. Catrett, 477 U.S. 317, 324 (1986)).

19

S.C. Jur. Intellectual Prop. § 76 (2011) ("If no understanding of confidentiality exists, there can be no secrecy regarding information disclosed."), and (2) this failure precluded Greenfield from relying on the protection of intellectual property afforded by the Act. See id. § 73 ("South Carolina's statutory definition of a trade secret requires that the secret be 'the subject of efforts that are reasonable under the circumstances to maintain its secrecy.'" (quoting S.C. Code Ann. § 39-8-20(5)(a)(ii))).

## B. Contract

A contract, under South Carolina case law, is defined as

> an obligation which arises from actual agreement of the parties manifested by words, oral or written, or by conduct. If agreement is manifested by words, the contract is said to be express. If it is manifested by conduct, it is said to be implied. In either case the parties must manifest a mutual intent to be bound. Without the actual agreement of the parties, there is no contract.

Stanley Smith & Sons v. Limestone Coll., 322 S.E.2d 474, 477 (S.C. Ct. App. 1984) (internal citations omitted).

"The essentials of a contract [thus] include an offer and acceptance." Benya v. Gamble, 321 S.E.2d 57, 60 (S.C. Ct. App. 1984); see also Hodge v. Nat'l Fid. Ins. Co., 68 S.E.2d 636, 639 (S.C. 1952) ("Regardless of which party makes the offer

20

or proposal, its acceptance by the other is necessary to the creation of the contract."). In this case, Greenfield points to four pieces of evidence, which he believes demonstrate the formulation of a binding agreement with Erwin-Penland.

First, Greenfield cites a March 28, 2006 email that demonstrates the parties discussed forming an LLC with Verizon Wireless if it agreed to fund the "How Sweet the Sound" project, 50% of which would be owned by Verizon Wireless and 50% of which would be owned by 1st Approach and Erwin-Penland. Second, Greenfield relies on two slides from the April 26, 2006 presentation to Verizon Wireless indicating the "How Sweet the Sound" concept was created jointly by 1st Approach and Erwin-Penland and that they offered Verizon Wireless 40% of net revenues if it would agree to fund the project. Third, Greenfield generally points to evidence that he was responsible for creating at least 50% of the "How Sweet the Sound" marketing scheme. Fourth, Greenfield references his work scaling back the "How Sweet the Sound" proposal to address Verizon Wireless' budgetary concerns, resulting in a new plan similar to that which Verizon Wireless and Erwin-Penland later implemented without his assistance.

Greenfield's first two pieces of evidence do indicate that he and Erwin-Penland reached an agreement concerning the concept they would initially pitch to Verizon Wireless. What is

21

lacking from the record, however, is any evidence demonstrating that Verizon Wireless ever accepted their proposed terms. And it is clear that Verizon Wireless' acceptance of the offer was a condition precedent to the formation of the LLC which Greenfield and Erwin-Penland had discussed.[13] See Rickborn v. Liberty Life Ins. Co., 468 S.E.2d 292, 300 (S.C. 1996) ("A meeting of minds is based upon the intent and purposes as shown by all the circumstances."). Because the necessary condition precedent of acceptance was never satisfied, no reasonable finder of fact would conclude the parties reached a binding agreement. See McGill v. Moore, 672 S.E.2d 571, 575 (S.C. 2009) ("If a contract contains a condition precedent, that condition must either occur or it must be excused before a party's duty to perform arises."); Allstate Ins. Co. v. Estate of Hancock, 545 S.E.2d 845, 847 (S.C. Ct. App. 2001) ("[N]o contract arises until the offer is accepted and all conditions precedent are met.").

Greenfield's other evidence, which indicates he was responsible for developing portions of the "How Sweet the Sound" project later implemented by Verizon Wireless and Erwin-Penland, is insufficient to change our analysis. The relevant question

---

[13] See Alexander's Land Co. v. M & M & K Corp., 703 S.E.2d 207, 214 (S.C. 2010) ("A condition precedent is an act which must occur before performance by the other party is due." (quotation omitted)).

on Greenfield's contract claim is not whether Erwin-Penland and Greenfield collaborated in formulating the "How Sweet the Sound" proposal submitted to Verizon Wireless — record evidence makes clear they did. Rather, it is whether Greenfield and Erwin-Penland ever reached a binding agreement concerning the implementation of that scheme. On this record, the district court did not err in concluding there is insufficient evidence for a reasonable finder of fact to conclude that an agreement as to the "How Sweet the Sound" plan's execution was ever reached.

## C. Unjust Enrichment

Under South Carolina law, "quantum meruit, quasi-contract, and implied by law contract are equivalent terms for an equitable remedy." Myrtle Beach Hosp., Inc. v. City of Myrtle Beach, 532 S.E.2d 868, 872 (S.C. 2000). Obtaining this remedy requires Greenfield to show (1) he conferred a benefit upon Erwin-Penland and the third-party defendants, (2) they realized some value from the benefit, and (3) it would be inequitable for Erwin-Penland and the third-party defendants to retain the benefit without paying Greenfield its value. See Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P., 684 S.E.2d 756, 764 (S.C. 2009); Sauner v. Pub. Serv. Auth. of S.C., 581 S.E.2d 161, 167 (S.C. 2003).

23

The list of benefits Greenfield alleges he conferred on Erwin-Penland and the third-party defendants includes (1) trademark rights, (2) an Effie Award,[14] (3) the BET television special, (4) various financial benefits resulting from the "How Sweet the Sound" series, and (5) intellectual property related to the competitions. As explained below, Greenfield possessed no trademark related to the "How Sweet the Sound" concept; he was therefore unable to confer such a benefit on Erwin-Penland and the third-party defendants. See infra Part IV.D. We further conclude that Greenfield cannot equitably take credit for "conferring" critical and financial success on the "How Sweet the Sound" project when he played no role in the execution and production of the work.[15]

---

[14] In 1968, the American Marketing Association established an annual awards program known as the "Effie Awards" to recognize the most effective advertising efforts in the United States.

[15] The district court correctly found that

[b]y his own admission, Greenfield has not expended 'any time or effort having the concerts go forward,' had no involvement in the 'day-to-day' operations of the concerts, has not worked on any concert logistics, has not lined up any churches, booked any venues, and has not traveled for the project. By contrast, Erwin-Penland, which has worked on the ["How Sweet the Sound"] project [from] 2007 through the present, has been compensated for the actual work it performed on the . . . project. Such compensation for work performed does not constitute unjust enrichment.

J.A. at 200.

That leaves Greenfield's argument that he contributed valuable intellectual property to the project in conceptualizing the general marketing scheme Erwin-Penland and Verizon Wireless later utilized. Given the fact that (1) Greenfield's only claim to a protected intellectual property right arises under the Act, and (2) we have already concluded the "How Sweet the Sound" concept fails to meet the Act's definition of a "trade secret," see supra Part IV.A, Greenfield is unable to show that he conferred any intellectual property benefit on Erwin-Penland and the third-party defendants. See Sauner, 581 S.E.2d at 167 (requiring a plaintiff "confer[] a non-gratuitous benefit on the defendant").

We consequently agree with the district court that Greenfield failed to demonstrate he conferred a benefit upon the defendants that would be inequitable for them to keep without paying its value. Summary judgment in favor of the defendants on Greenfield's unjust-enrichment claim is therefore appropriate. See Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008) (requiring "a nonmoving party" on summary judgment "produce some evidence (more than a 'scintilla') upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986))).

25

D. Trademark Cancellation

Greenfield also contends the district court erred in refusing to cancel Erwin-Penland's "How Sweet the Sound" mark. See 15 U.S.C. § 1064(3). This argument is based on Greenfield's contention that Erwin-Penland fraudulently failed to reveal in trademark registration paperwork, filed with the United States Patent and Trademark Office, that he too had "a credible right to use the mark." Opening Br. at 41. We find no merit to Greenfield's trademark-cancellation claim.

As this Court has previously explained, "[t]here is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. . . . [T]he right to a particular mark grows out of its use, not its mere adoption." Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco, 329 F.3d 359, 364 (4th Cir. 2003) (quoting United Drug Co. v Theodore Rectanus, Co., 248 U.S. 90, 97 (1918)) (emphasis added); see also Sengoku Works Ltd. v. RMC Int'l, Ltd., 96 F.3d 1217, 1219 (9th Cir. 1996) ("To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services.") (emphasis added).

26

Nothing in Greenfield's Opening Brief, or the record, suggests he ever used the "How Sweet the Sound" mark in commerce.[16]   See Opening Br. at 42-42.   Therefore, Greenfield failed to establish the necessary factual predicate for his trademark-cancellation claim.   See Gen. Healthcare Ltd. v. Qashat, 364 F.3d 332, 335 (1st Cir. 2004) ("Trademark rights may arise under either the Lanham Act or under common law, but in either circumstance, the right is conditioned upon use in commerce.") (emphasis added).   We accordingly uphold the district court's grant of summary judgment in favor of Erwin-Penland.   See Celotex Corp., 477 U.S. at 323 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

V.

For all of the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

---

[16]   We decline to address the additional arguments raised in Greenfield's Reply Brief, as "arguments not specifically raised and addressed in opening brief, but raised for the first time in reply, are deemed waived."   Moseley v. Branker, 550 F.3d 312, 325 n.7 (4th Cir. 2008).

27

GREGORY, Circuit Judge, dissenting in part:

This case is about just compensation for an inventor of a marketing scheme who was later cut out of the deal by two entities that had a long-standing relationship with each other: Verizon and its advertising agency of record, Erwin-Penland ("EP"). The majority takes the case away from the jury, concluding that no rational trier of fact could find the inventor, Greenfield, had taken efforts reasonable under the circumstances to protect the scheme's secrecy. Such a conclusion is premature. There is a rich record with details pointing in both directions regarding Greenfield's efforts to protect his ideas, with both copyright and confidentiality notices, including one that was specifically removed by EP without Greenfield's permission, that indicates while the arguments in his favor may ultimately be overcome, a jury should at least have been allowed to view his efforts.

There are three additional points that the majority overlooks. First, the majority ignores a proposition advanced by the very treatise it cites: that disclosure to prospective clients in the advertising context does not necessarily vitiate secrecy, but rather may, in fact, be reasonable. Second, the majority assumes without record support that other advertising agencies were competitors. These agencies may well have been collaborators whose roles were to take over portions of the plan

that could not be executed by EP and 1st Approach, meaning their presence is a fact the jury has a right to consider and ultimately discount. The majority thus skews this fact in the light most favorable to the movants. Finally, the argument that Greenfield disclosed some secrets to Captain D's is irrelevant because these were not the same secrets presented to Verizon, in particular they did not include the so-called Pastor Packet, which was an idea unique to the proposal drafted for the wireless giant. For these reasons, I respectfully dissent as to the trade secret cause of action. I concur in the remainder of the majority's opinion, and do not discuss it here.

I.

Unless otherwise noted, all of the following facts are uncontested. I relate them here because there are several important points that the majority omits.

Jeffrey Greenfield is the sole employee of two marketing companies, 1st Approach and Buzznations. These companies specialize in branded entertainment: the combination of a brand with a live event synthesized with internet strategies, word-of-mouth, grassroots "buzz" marketing, and traditional print and broadcast media. In addition to being the principal at both companies, he gives lectures around the country. At one of his lectures, he met Joseph Erwin, the

president and founder of EP, a regional advertising agency located in Greenville, South Carolina.[1] After hearing his talk about branded marketing, Erwin approached Greenfield and suggested that the two collaborate.

1st Approach and EP pursued an account with Captain D's, a seafood restaurant chain primarily located in the South, to be what is known in the industry as the "agency of record." There is hot dispute over who first originated the concept,[2] but the two parties agree that the advertising campaign to Captain D's centered around the production of a marketing campaign called "Amazing Grace," after the hymn. The campaign was designed to be a reality television series modeled on the show American Idol in a competition for the best church choir in America.

There was no non-disclosure agreement ("NDA") between the parties. Nevertheless, the two had extensive collaboration including conference calls, meetings, and materials sharing. The information Greenfield transmitted to EP, in the form of

---

[1] EP was purchased by Hill Holliday Connors Cosmopulos, Inc., a national advertising agency that is owned by Interpublic Group.

[2] Greenfield testifies that it was his idea to have the gospel choir competition. In contrast, Erwin testifies that someone on his team – who used to be a political operative in the democratic South – had the idea of using churches and faith-based singing to bring the communities together.

PowerPoint slides as part of a presentation "deck," was under explicit confidentiality provisions. Specifically, the disclaimer on the slides presented to Captain D's read: "[t]he ideas and concepts contained within this document are the sole and confidential property of 1st Approach, LLC and will not be shared with any other agency or utilized without prior written consent." J.A. 1375.

After Captain D's turned down the bid, 1st Approach and EP decided to market it elsewhere. EP was the ad agency of record for Verizon. Verizon was EP's top revenue-generating client and had been for some number of years. EP had initial discussions with Verizon about potentially developing the "Amazing Grace" concept, which later became known as "How Sweet The Sound" ("HSTS"), after the second line of the song, for the wireless company. Verizon was trailing its competitors in the African American community, with only 17% of market-share as opposed to 25% overall, and needed a marketing strategy to reach this demographic.

When EP initially presented the HSTS idea in December 2005 to Verizon, it labeled the idea "Confidential and Proprietary Material by [EP]." J.A. 1577. Like the Captain D's disclaimer, the material read "[u]se, disclosure or distribution of this material is not permitted to any unauthorized persons or third parties except by written agreement." Id. The regional

31

Verizon employees passed on the information to Verizon's Chief Marketing Officer, Stratton, without the knowledge or consent of Greenfield.

After the December 2005 pitch, in which Greenfield did not participate, EP followed up with an April 2006 presentation. The contents of this presentation, a 30-plus PowerPoint slide deck, lie at the heart of the dispute, because Greenfield concedes in his deposition that the trade secrets in question were contained therein.[3] As part of the presentation, Greenfield came up with numerous ideas he claims were trade secrets including tax strategies and the so-called Pastor Packet, which was a direct mailing bundle sent to church preachers and choir directors that could be used to rope their congregations into signing up for Verizon subscriptions. Importantly, these secrets differ markedly from the information that was submitted to Captain D's, both in kind and in quantity, with the Pastor Packet being the most obvious example.

---

[3] Greenfield's reply brief alleges that there were trade secrets beyond what were contained in the April 2006 pitch at which other advertising agencies were present. (Appellant's Reply Br. at 27.) It is theoretically possible, then, that some of the secrets may not have been adequately protected, whereas others were. The majority does not consider this point. I need not express an opinion on their scope, however, as there are enough facts on this record for a jury to be able to consider the secrets even if they are limited to the April 2006 deck.

In the lead up to the April 2006 presentation, Greenfield and EP exchanged many emails and also participated in numerous conference calls with each other. On March 13, 2006, Greenfield drafted a budget that he sent to EP detailing the projected costs of HSTS. Verizon ultimately did not rely upon this budget – it went with a scaled-down version of the idea – but it did pick up the HSTS program and execute it in Memphis, Tennessee as a test market. The parties did not discuss what would happen if Verizon did not accept the deal, or as here accepted it, but in modified form. Greenfield, however, registered his idea with the Writer's Guild of America on February 15, 2006, with ownership vested in himself and EP.

At the April 2006 presentation to Verizon, Greenfield spoke only briefly, for as short as five minutes, and the people at Verizon do not remember him independently of this lawsuit. Nevertheless, the "deck" identified him and 1st Approach as the co-creators of the HSTS idea and included a copyright notice from EP and 1st Approach. At the meeting, at least one other advertising agency was present and possibly more. The deck was not marked "confidential." The record does not specify whether the advertising agencies were competitors or potential collaborators to 1st Approach or what the relationship was between Verizon, EP, and the agency or agencies. See J.A. 494-500 (discussing the role of the respective advertising

33

agencies). None of the people from advertising agencies or other attendees at the meeting were asked to sign a confidentiality agreement.

Greenfield was ultimately cut out of the process after the April 2006 pitch. In the two-month period following the presentation, he worked with EP to fine tune the proposal, scaling it back to reduce the television aspect since Verizon determined that aspect was not within its "core competency." On June 9, 2006, Greenfield participated in a conference call with EP in which Erwin affirmed the "partnership." The parties agreed that Greenfield would have to downsize the proposal to fit Verizon's needs. On June 19, 2006, Greenfield submitted his final work-product to EP, reducing the cost of the budget to $5.4 million. On November 22, 2006, Greenfield wrote to EP and asked whether Verizon had approved or turned down HSTS and said that if they had turned it down, he would like to shop around the idea to other potential clients. Allen Bosworth of EP responded by saying that the idea was "still being looked at" by Verizon and that Yahoo! Music was very interested in the deal. J.A. 1598. After that, Greenfield emailed EP on January 26, 2007, March 29, 2007, and July 26, 2007, but EP failed to respond.

EP claims that the reason it ceased to do business with Greenfield is because he was the "television man"; that if

34

Verizon decided it did not want to do that component of the advertising campaign, then it could simply eliminate him. However, the record shows that Verizon did adopt a proposal that was strikingly similar to Greenfield's original idea. Specifically, in conjunction with EP and other advertising agencies, Verizon in both 2008 and 2009 produced eleven events and a final competition, a one-hour documentary film, and a one-hour televised finals competition that aired on the Gospel Music Channel. According to Greenfield, the marketing campaign has been a financial boon to both Verizon and EP, substantially creating inroads into the African American community. The campaign for HSTS ultimately received an Effie Award, essentially the equivalent of an Oscar within the advertising community. EP also received trademark registration for HSTS.

## II.

There are three important inquiries that must be decided. First, as a threshold matter, is there a trade secret? Second, if there is a trade secret, was it adequately protected? Third, if it was adequately protected, was it improperly taken? The first inquiry, one that is assumed though not decided by the majority, is whether Greenfield has a protectable interest to begin with under South Carolina Code § 39-8-20(5). Because the

35

answer is not clearly established, I would certify it for the South Carolina courts.

The Act defines trade secret to include "a formula, pattern, compilation, program, device, method, technique, product, system, or process, design, prototype, procedure, or code." S.C. Code Ann. § 39-8-20(5)(a). It goes on to specify that:

> [a] trade secret may consist of a simple fact, item, or procedure, or a series or sequence of items or procedures which, although individually could be perceived as relatively minor or simple, collectively can make a substantial difference in the efficiency of a process or the production of a product, or may be the basis of a marketing or commercial strategy. The collective effect of the items and procedures must be considered in any analysis of whether a trade secret exists and not the general knowledge of each individual item or procedure.

Id. at (5)(b). Although there is little to no caselaw on the issue, it appears from the statute's text that a marketing strategy that consists of disparate ideas woven together can be a trade secret.

Verizon argues that there is nothing protectable contained in the April 2006 slides. Specifically, Verizon claims that because the individual elements of the trade secret are in the public domain there is no trade secret. The district court seemed to agree with this proposition, holding that "[t]he concepts themselves are generalized principles that are well-known in the advertising and marketing industries and are

36

readily ascertainable by others." J.A. 165-66. However, neither Verizon nor the district court cited any authority to support their proposition that because some elements of a marketing strategy are public, their "collective effect" cannot constitute a trade secret.

Both the text of the statute as well as what little law exists on the topic seem to go in the opposite direction. That is to say, even if elements of the trade secret are public, if the particular alchemy behind the item as a whole is not, then it is considered protectable. Greenfield uses the analogy of a Mrs. Fields cookie; general recipes for chocolate chip treats are common, but the recipe specific to Mrs. Fields is still considered a trade secret. Several cases support his point. See, e.g., Lowndes Products, Inc. v. Brower, 259 S.C. 322, 328 (1972) ("A trade secret can exist in the unique combination of otherwise known components; although each of its parts, by itself, may be in the public domain, the unified process, design and operation of the combination may be the essence of the secret."); Servo Corp. of Am. v. General Elec. Co., 393 F.2d 551, 555 (4th Cir. 1968) (a litigant may not "avoid the consequences of the breach of confidence by piecing together in retrospect bits of information which had been disclosed in a variety of places and which as a combination were not clearly a matter of public knowledge."); Elizabeth

37

Carpenter, 20 S.C. Jur. Intellectual Property § 74 n.3 (2010) (collecting cases); Louis Altman & Malla Pollack, 2 Callman on Unfair Competition, Trademarks, and Monopolies § 14:22 (2008) ("The internal facts of a business . . . [t]he subject matter is not necessarily new, novel or unique; it may be something which, when connected with a known factor, may be so valuable to a business that its continued concealment from others is of paramount importance."). However, general business know-how is not protected. Id. Similarly, marketing strategies that are commonly employed are not protectable. Id.[4]

Greenfield alleges that the particular combination of his marketing plan, with judges selecting the best choirs after they submit short segments, text message voting, and audience participation, constituted the essence of his secret. Even though there are particular elements that are within the public domain, there are kernels of ideas that are both original and unknown, and as a result not readily ascertainable by proper means. Specifically, the idea of the Pastor Packet – which was utilized by Verizon to outreach to ministers and choir directors – is an idea original to Greenfield that was ascertainable only

_____

[4] It is also important to note that South Carolina has no "novelty" requirement, unlike other jurisdictions such as New York and California that require the combination to be new, much like a patent, must not be "obvious." The district court seemed to impose just such a requirement, but I find that to be unsupported by South Carolina law.

through his private presentation. Thus, while in retrospect some of these ideas may be self-evident, at the time they were created they were not.

More importantly, however, even if we were to conclude that the April 2006 presentation contained no trade secrets because the individual elements were "readily ascertainable," the existence of a trade secret is generally one of fact left to the jury, not for the judge, though a few courts consider the issue to be a mixed question and a small minority consider it to be an issue of law. Louis Altman & Malla Pollack, 2 Callman on Unfair Competition, Trademarks and Monopolies § 14:27 ns.61-63 (Supp. 2010-2) (collecting cases). South Carolina has not weighed in on the issue and there are no cases that I have uncovered from this jurisdiction addressing the point. I would thus certify the issue to the South Carolina courts.

III.

The next question is whether Greenfield took adequate steps to protect his trade secret. The district court granted summary judgment on the basis that Greenfield failed to adequately protect his secrets because he disclosed them at a business pitch to Verizon and the business pitch included third-parties: other advertising agencies whose role in the process is unspecified. The majority agrees and concludes that no

39

reasonable jury could find otherwise.  I disagree.  It is striking to me, for instance, that Greenfield did place confidentiality notices on his materials – notices that were only subsequently removed by EP.  I do not believe that EP's unilateral actions should vitiate efforts to protect secrecy nor that a reasonable jury should be foreclosed from agreeing.

Under South Carolina law, the owner of a trade secret must show that she or he made "efforts that are reasonable under the circumstances to maintain its secrecy."  S.C. Code Ann § 39-8-20(5)(a)(ii).  Thus, "[o]ne may not claim as a trade secret information 'completely disclosed by the goods one markets'" or "information that has been disclosed to the public in a way which makes 'the "secret" so obvious as to render meaningless' any claim of confidentiality."  Carpenter, supra, at § 74.  Nevertheless, "courts have recognized that some disclosure is necessary for enjoyment of the benefits of a trade secret and that not every disclosure effectively destroys secrecy."  Id.  A quintessential example of protected disclosure is a pitch to potential customers.  Id. at n.7 (citing ILG Indus., Inc. v. Scott, 49 Ill. 2d 88, 94 (1971)).  Most importantly, like the question of whether or not a trade secret exists as a threshold matter, the question of adequate protective measures is, at least under Fourth Circuit caselaw, one of fact.  Trades Corp. v. Guy F. Atkinson Co.. 996 F.2d 655, 664 (4th Cir. 1993)

40

(analyzing a Maryland law that, for our purposes, is identical); Altman & Pollack, supra, § 14:26, n.27 (collecting cases). Indeed, it is a rare case where summary judgment should be granted on this issue because "the answer depends on a balancing of costs and benefits that will vary from case to case and so require estimation and measurement by persons knowledgeable in the particular field of endeavor involved." Rockwell Graphic Systems, Inc. v. Dev Industries, Inc., 925 F.2d 174, 179 (7th Cir. 1991). Factors that should be considered by a jury in evaluating secrecy include, according to the Restatement of Torts:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Restatement (First) of Torts § 757, cmt. b (1939).

In the instant matter, these factors suggest that there was enough of a track record for the jury to be able to hear the case. First and foremost, the pitch was not open to the general public; it was a closed setting and the information was thus not known outside the business. While it is true other advertising agencies may have been there, the precise nature of

41

the relationships is not fleshed out by the record. Indeed, it is a fact that can be spun in many directions, and, according to summary judgment standards, deserves to be construed in Greenfield's favor. These agencies may or may not have been competitors looking to poach the idea from EP and 1st Approach, or they may have been collaborators that would be brought in to handle parts of the deal that were beyond the competencies of EP and 1st Approach. They may have been agents of Verizon, and they may have had contractual relationships with EP. To rest the entire decision on this point seems to me a thin reed indeed. I think it would be far better to allow the jury to weigh and consider this in addition to other evidence at trial.

The majority also makes much of the disclosure to Captain D's, but there are two responsive points. First, as stated above, disclosure to potential customers is a protected activity. Second, the content of the secrets that were disclosed to Captain D's differs from the content of the trade secrets – in particular the Pastor Packet – that made up the idea Greenfield claims Verizon misappropriated. Thus the majority seems to be comparing apples to oranges.

Next, even if the other advertising agencies or Captain D's were competitors as the majority simply assumes without support, the deck said that it was copyrighted to EP and 1st Approach. 1st Approach also had confidentiality notices on

42

materials. J.A. 910; J.A. 941; J.A. 1061-64; J.A. 1186; J.A. 1375 (including information that was in talks and Captain D's pitch and confidentiality notices from EP on their own behalf). Indeed, the confidentiality notices that were lacking on the final deck were, according to Greenfield, removed without his consent. (Appellant's Br. at 36-37.) I do not believe that it is appropriate to hold that EP's unauthorized and unilateral efforts vitiate Greenfield's protective efforts or render them insufficient as a matter of law.

While a business pitch may be "speculative," at least according to Verizon and EP, it arguably does not allow the customer to appropriate the ideas in the pitch without paying for them. Any disagreement over the function of business sales, and precisely how confidential they are intended to be and actually were, is further justification for vacating summary judgment and allowing the matter to go to trial.

The contractual relationship between Verizon and EP also militates against the degree of disclosure necessitated; because the two companies had a very close working relationship and Verizon was EP's biggest client, it is within the purview of the jury to find that secrets might fall within their legal relationship. More specifically, the jury could determine an expectation of secrecy was part of the overall relationship between the two companies. See, e.g., Burten v. Milton Bradley

43

<u>Co.</u>, 763 F.2d 461, 463 (1st Cir. 1985) ("A confidential relationship generally arises by operation of law from the affiliations of the parties and the context in which the disclosures are offered . . . a confidential relationship typically will be implied where disclosures have been made in business relationships between employers and employees, purchasers and suppliers, or prospective licensees and licensors.") (internal citations omitted).

Furthermore, the fact that Greenfield himself kept the idea for the series a secret is telling. He waited after being assured that Verizon was still considering the pitch instead of taking it to other potential customers, suggesting he viewed the matter as both secret and proprietary.

Finally, Verizon points to the fact that there was no NDA as an example of why Greenfield failed to take reasonable efforts to protect his material. I strongly caution against placing too much reliance on the existence of an NDA. While indicative of secrecy, it is no talisman. <u>Altman & Pollack</u>, <u>supra</u>, § 14:26 (noting four factors, of which an NDA is only one). Indeed, according to the treatise on South Carolina law cited by the majority, a confidential relationship may be implied from the circumstances of the disclosure rather than be in the form of an express agreement, as mentioned previously. <u>Carpenter</u>, <u>supra</u>, at § 76 ("Written agreements are not, however,

44

essential to protect secret information disclosed to employees or others in every case. The required agreement may be implied by the confidential relation itself."). Thus, I believe there are enough facts for a jury at least to be able to evaluate this issue for itself.

IV.

Last, there is the question as to whether the secret was indeed misappropriated if it did exist in the first place. The district court held that it was not; even if the materials were confidential, it ruled, it had not been acquired by "improper means." Under South Carolina law, "improper means" means "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, duties imposed by the common law, statute, contract, license, protective order, or other court or administrative order, or espionage through electronic or other means." S.C. Code Ann. § 39-8-20(1) (emphasis added). The district court ruled that because Verizon did not consider the material confidential, a fortiori it could not have been acquired through improper means. I disagree. Verizon knew that Greenfield had a role in formulating the marketing strategy, as evidenced by 1st Approach's inclusion in the 2006 deck, and a reasonable jury could find that Verizon intentionally induced EP to breach its duty of secrecy and cut

45

him out from the deal.  This is true regardless of whether or not key Verizon officials knew specifically who Greenfield was.

V.

For the foregoing reasons, I affirm in part and dissent in part.

46